UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT


No. 95-2205

AMY COHEN, ET AL.,
Plaintiffs - Appellees,

v.

BROWN UNIVERSITY,
Defendants - Appellants.



ERRATA SHEET

The opinion of this Court issued on November 21, 1996, is
amended as follows:

On page 9, line 15, replace "women. Id. at 981." with 
"women, id. at 981.". 

On page 10, line 18, delete extra space between "sports" and
"--".

On page 11, line 9, delete "id.,". 

On page 11, line 12, delete "totals," id." and replace with 
"totals." Id.". 

On page 11, line 16, delete "id.,". 

On page 15, line 36, delete "then" and replace with
"former".

On page 24, line 13, insert comma after "and".

On page 26, line 14, delete "mere" and replace with "bare".

On page 38, line 17, insert "for women" between "treatment"
and "by".

On page 42, line 18, replace "to women" with "for women".

On page 43, line 8, delete "Cf." and replace it with "See". 

On page 47, line 7, delete "athletics" before
"opportunities".

On page 55, lines 9 and 10, delete "in varsity competition,"
and replace it with "at the varsity level,".

On page 59, line 19, delete "(1989)".

On page 62, line 5, delete "(1973)".

On page 62, line 6, delete "(1989)".

On page 64, lines 28 and 29, replace "is merely" with "is,
in effect,".

On page 65, line 21, insert "as it applies to athletics"
between "Title IX" and "is".

On page 68, line 2, insert a new paragraph beginning with
"Brown first contends".

On page 68, line 9, insert a new paragraph beginning with
"Brown also suggests".

On page 79, line 22, replace "Court" with "court".

On page 80, lines 3 and 6, replace "Court" with "court". 

On page 86, lines 5 and 13, replace "Court" with "court". 

On page 88, line 22, cite to the C.F.R. should be: "34
C.F.R. 106.41(b) (1995)".

On page 89, replace text on line 1 with: "one sex, however,
and where "athletic opportunities for members of that sex have
previously been limited, members of the excluded sex must be
allowed to".

On page 89, lines 11-15: Delete two sentences: "When the
university chooses a non-contact sport, 34 C.F.R. 106.41(b)
requires that the school sponsors one team for each gender, or
allow both sexes to try-out. If the university chooses a contact
sport, however, try-outs can be restricted to one sex.".

On page 89, line 17, delete "hockey".

On page 95, last line, delete comma after "the
interpretation chosen".

On page 96, line 10, replace "Appellees" with "appellees".

On page 98, line 17, replace "Appellees" with "appellees".

On page 100, line 19, replace "Appellees" with "appellees".

On page 101, lines 8 and 11, replace "Appellees" with
"appellees".

-2-

On page 103, line 2, replace "Court" with "court".

On page 104, line 30, replace "female" with "females".

On page 105, line 18, replace "Court" with "court".

-3-

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 95-2205

AMY COHEN, ET AL.,
Plaintiffs - Appellees,

v.

BROWN UNIVERSITY, ET AL.,
Defendants - Appellants.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Raymond J. Pettine, Senior U.S. District Judge] 



Before

Torruella, Chief Judge, 
Bownes, Senior Circuit Judge, 
and Stahl, Circuit Judge. 


Joan A. Lukey and Walter B. Connolly, Jr., with whom Hale 
and Dorr, Alison B. Marshall, Miller, Canfield, Paddock & Stone, 
Beverly E. Ledbetter, General Counsel, Brown University, Julius 
C. Michaelson, Jeffrey S. Michaelson and Michaelson & Michaelson 
were on brief for appellants.
Martin Michaelson, with whom Amy Folsom Kett, Suzanne M. 
Bonnet, Hogan & Hartson L.L.P. and Sheldon E. Steinbach, General 
Counsel, American Council on Education, were on brief for
American Council on Education, Association of American
Universities, National Association of Independent Colleges and
Universities, and National Association of State Universities and
Land-Grant Colleges, amici curiae.
George A. Davidson, Carla A. Kerr, Seth D. Rothman and 
Hughes Hubbard & Reed on brief for Baylor University, Boston 
University, Colgate University, College of the Holy Cross,
Colorado State University, Fairfield University, George
Washington University, John Hopkins University, Lafayette
College, New York University, Saint Peter's College, Southern
Methodist University, Tulane University, University of Arkansas,
University of Nebraska, University of Notre Dame, and Wake Forest
University, amici curiae.
Melinda Ledden Sidak and Anita K. Blair on brief for The 
Independent Women's Forum, amicus curiae.
Stephen S. Ostrach, Todd S. Brilliant and New England Legal 

-1-

Foundation on brief for American Baseball Coaches Association, 
College Swim Coaches Association of America, National Wrestling
Coaching Association and United States Water Polo, amici curiae.
Lynette Labinger, with whom Roney & Labinger, Amato A. 
DeLuca, DeLuca & Weizenbaum, Ltd., Raymond Marcaccio, Blish & 
Cavanagh, Sandra L. Duggan, Sandra L. Duggan, Esq., P.C., Arthur 
H. Bryant, Leslie A. Brueckner, and Trial Lawyers for Public 
Justice, P.C. were on brief for appellees. 
Deborah L. Brake, with whom Marcia D. Greenberger, Judith C. 
Appelbaum and National Women's Law Center were on brief for 
National Women's Law Center, American Association of University
Women/AAUW Legal Advocacy Fund, American Civil Liberties Union
Women's Rights Project, California Women's Law Center, Center For
Women Policy Studies, Connecticut Women's Education and Legal
Fund, Equal Rights Advocates, Feminist Majority Foundation, Girls
Incorporated, National Association for Girls and Women in Sport,
National Association for Women in Education, National Coalition
for Sex Equity in Education, National Commission on Working
Women, National Council of Administrative Women in Education,
National Education Association, National Organization for Women
Foundation, Now Legal Defense and Education Fund, National
Softball Coaches Association, Northwest Women's Law Center,
Parents for Title IX, Rhode Island Affiliate American Civil
Liberties Union, Women Employed, Women's Basketball Coaches
Association, Women's Law Project, Women's Legal Defense Fund,
Women's Sports Foundation, and YWCA of the USA, amici curiae.
Deval L. Patrick, Assistant Attorney General, Isabelle Katz 
Pinzler, Deputy Assistant Attorney General, Dennis J. Dimsey and 
Lisa W. Edwards, Attorneys, Department of Justice, on brief for 
the United States, amicus curiae.



November 21, 1996


-2- -2-

BOWNES, Senior Circuit Judge. This is a class BOWNES, Senior Circuit Judge. 

action lawsuit charging Brown University, its president, and

its athletics director (collectively "Brown") with

discrimination against women in the operation of its

intercollegiate athletics program, in violation of Title IX

of the Education Amendments of 1972, 20 U.S.C. 1681-1688

("Title IX"), and its implementing regulations, 34 C.F.R. 

106.1-106.71. The plaintiff class comprises all present,

future, and potential Brown University women students who

participate, seek to participate, and/or are deterred from

participating in intercollegiate athletics funded by Brown.

This suit was initiated in response to the demotion

in May 1991 of Brown's women's gymnastics and volleyball

teams from university-funded varsity status to donor-funded

varsity status. Contemporaneously, Brown demoted two men's

teams, water polo and golf, from university-funded to donor-

funded varsity status. As a consequence of these demotions,

all four teams lost, not only their university funding, but

most of the support and privileges that accompany university-

funded varsity status at Brown. 

Prior to the trial on the merits that gave rise to

this appeal, the district court granted plaintiffs' motion

for class certification and denied defendants' motion to

dismiss. Subsequently, after hearing fourteen days of

testimony, the district court granted plaintiffs' motion for

-3- -3-

a preliminary injunction, ordering, inter alia, that the 

women's gymnastics and volleyball teams be reinstated to

university-funded varsity status, and prohibiting Brown from

eliminating or reducing the status or funding of any existing

women's intercollegiate varsity team until the case was

resolved on the merits. Cohen v. Brown Univ., 809 F. Supp. 

978, 1001 (D.R.I. 1992) ("Cohen I"). A panel of this court 

affirmed the district court's decision granting a preliminary

injunction to the plaintiffs. Cohen v. Brown Univ., 991 F.2d 

888, 907 (1st Cir. 1993) ("Cohen II"). In so doing, we 

upheld the district court's analysis and ruled that an

institution violates Title IX if it ineffectively

accommodates its students' interests and abilities in

athletics under 34 C.F.R. 106.41(c)(1) (1995), regardless

of its performance with respect to other Title IX areas. Id. 

at 897. 

On remand, the district court determined after a

lengthy bench trial that Brown's intercollegiate athletics

program violates Title IX and its supporting regulations.

Cohen v. Brown Univ., 879 F. Supp. 185, 214 (D.R.I. 1995) 

("Cohen III"). The district court ordered Brown to submit 

within 120 days a comprehensive plan for complying with

Title IX, but stayed that portion of the order pending

appeal. Id. The district court subsequently issued a 

modified order, requiring Brown to submit a compliance plan

-4- -4-

within 60 days. Modified Order of May 4, 1995. This action

was taken to ensure that the Order was "final" for purposes

of this court's jurisdiction, and to expedite the appeal

process. Id. Finding that Brown's proposed compliance plan 

was not comprehensive and that it failed to comply with the

opinion and order of Cohen III, the district court rejected 

the plan and ordered in its place specific relief consistent

with Brown's stated objectives in formulating the plan.

Order of August 17, 1995 at 11. The court's remedial order

required Brown to elevate and maintain at university-funded

varsity status the women's gymnastics, fencing, skiing, and

water polo teams. Id. at 12. The district court's decision 

to fashion specific relief was made, in part, to avoid

protracted litigation over the compliance plan and to

expedite the appeal on the issue of liability. Id. at 11. 

The district court entered final judgment on September 1,

1995, and on September 27, 1995, denied Brown's motion for

additional findings of fact and to amend the judgment. This

appeal followed.

Brown claims error in certain evidentiary rulings

made during the trial and in the district court's order of

specific relief in place of Brown's proposed compliance plan.

In addition, and as in the previous appeal, Brown challenges

on constitutional and statutory grounds the test employed by

the district court in determining whether Brown's

-5- -5-

intercollegiate athletics program complies with Title IX. In

the first appeal, a panel of this court elucidated the

applicable legal framework, upholding the substance of the

district court's interpretation and application of the law in

granting plaintiffs' motion for a preliminary injunction,1

and rejecting essentially the same legal arguments Brown

makes here.

Brown contends that we are free to disregard the

prior panel's explication of the law in Cohen II. Brown's 

efforts to circumvent the controlling effect of Cohen II are 

unavailing, however, because, under the law of the case

doctrine, we are bound in this appeal, as was the district

court on remand, by the prior panel's rulings of law. While

we acknowledge that the law of the case doctrine is subject

to exceptions, we conclude that none applies here, and that

the decision rendered by the prior panel in the first appeal

is not, as Brown claims, "legally defective." Accordingly,

we decline Brown's invitation to undertake plenary review of

issues decided in the previous appeal and treat Cohen II as 

controlling authority, dispositive of the core issues raised

here. 

 

1. The prior panel upheld the district court's rulings in
all respects save one. We held that the district court erred
in placing upon Brown the burden of proof under prong three
of the three-part test used to determine whether an
intercollegiate athletics program complies with Title IX,
discussed infra. Cohen II, 991 F.2d at 903.  

-6- -6-

We find no error in the district court's factual

findings or in its interpretation and application of the law

in determining that Brown violated Title IX in the operation

of its intercollegiate athletics program. We therefore

affirm in all respects the district court's analysis and

rulings on the issue of liability. We do, however, find

error in the district court's award of specific relief and

therefore remand the case to the district court for

reconsideration of the remedy in light of this opinion.

I. I.

The relevant facts, legal principles, and

procedural history of this case have been set forth in

exhaustive detail in the previous opinions issued in this

case. Thus, we recite the facts as supportably found by the

district court in the course of the bench trial on the merits

in a somewhat abbreviated fashion. 

As a Division I institution within the National

Collegiate Athletic Association ("NCAA") with respect to all

sports but football, Brown participates at the highest level

of NCAA competition.2 Cohen III, 879 F. Supp. at 188. Brown 

operates a two-tiered intercollegiate athletics program with

respect to funding: although Brown provides the financial

resources required to maintain its university-funded varsity

 

2. Brown's football team competes in Division I-AA, the
second highest level of NCAA competition. Cohen III, 879 F. 
Supp. at 188 n.4.

-7- -7-

teams, donor-funded varsity athletes must themselves raise

the funds necessary to support their teams through private

donations. Id. at 189. The district court noted that the 

four demoted teams were eligible for NCAA competition,

provided that they were able to raise the funds necessary to

maintain a sufficient level of competitiveness, and provided

that they continued to comply with NCAA requirements. Id. at 

189 n.6. The court found, however, that it is difficult for

donor-funded varsity athletes to maintain a level of

competitiveness commensurate with their abilities and that

these athletes operate at a competitive disadvantage in

comparison to university-funded varsity athletes. Id. at 

189. For example, the district court found that some schools

are reluctant to include donor-funded teams in their varsity

schedules3 and that donor-funded teams are unable to obtain

varsity-level coaching, recruits, and funds for travel,

equipment, and post-season competition. Id. at 189-90.  

Brown's decision to demote the women's volleyball

and gymnastics teams and the men's water polo and golf teams

from university-funded varsity status was apparently made in

response to a university-wide cost-cutting directive. Cohen 

I, 809 F. Supp. at 981. The district court found that Brown 

 

3. Two schools declined to include Brown in future varsity
schedules when women's volleyball was demoted to donor-funded
status. Cohen II, 991 F.2d at 892 n.2; Cohen I, 809 F. Supp. 
at 993.

-8- -8-

saved $62,028 by demoting the women's teams and $15,795 by

demoting the men's teams, but that the demotions "did not

appreciably affect the athletic participation gender ratio."

Cohen III at 187 n.2.  

Plaintiffs alleged that, at the time of the

demotions, the men students at Brown already enjoyed the

benefits of a disproportionately large share of both the

university resources allocated to athletics and the

intercollegiate participation opportunities afforded to

student athletes. Thus, plaintiffs contended, what appeared

to be the even-handed demotions of two men's and two women's

teams, in fact, perpetuated Brown's discriminatory treatment

of women in the administration of its intercollegiate

athletics program. In the course of the preliminary

injunction hearing, the district court found that, in the

academic year 1990-91, Brown funded 31 intercollegiate

varsity teams, 16 men's teams and 15 women's teams, Cohen I, 

809 F. Supp. at 980, and that, of the 894 undergraduate

students competing on these teams, 63.3% (566) were men and

36.7% (328) were women, id. at 981. During the same academic 

year, Brown's undergraduate enrollment comprised 52.4%

(2,951) men and 47.6% (2,683) women. Id. The district court 

also summarized the history of athletics at Brown, finding,

inter alia, that, while nearly all of the men's varsity teams 

were established before 1927, virtually all of the women's

-9- -9-

varsity teams were created between 1971 and 1977, after

Brown's merger with Pembroke College. Id. The only women's 

varsity team created after this period was winter track, in

1982. Id.  

In the course of the trial on the merits, the

district court found that, in 1993-94, there were 897

students participating in intercollegiate varsity athletics,

of which 61.87% (555) were men and 38.13% (342) were women.

Cohen III, 879 F. Supp. at 192. During the same period, 

Brown's undergraduate enrollment comprised 5,722 students, of

which 48.86% (2,796) were men and 51.14% (2,926) were women.

Id. The district court found that, in 1993-94, Brown's 

intercollegiate athletics program consisted of 32 teams, 16

men's teams and 16 women's teams. Id. Of the university- 

funded teams, 12 were men's teams and 13 were women's teams;

of the donor-funded teams, three were women's teams and four

were men's teams. Id. At the time of trial, Brown offered 

479 university-funded varsity positions for men, as compared

to 312 for women; and 76 donor-funded varsity positions for

men, as compared to 30 for women. Id. at 211. In 1993-94, 

then, Brown's varsity program -- including both university-

and donor-funded sports -- afforded over 200 more positions

for men than for women. Id. at 192. Accordingly, the 

district court found that Brown maintained a 13.01% disparity

between female participation in intercollegiate athletics and

-10- -10-

female student enrollment, id. at 211, and that "[a]lthough 

the number of varsity sports offered to men and women are

equal, the selection of sports offered to each gender

generates far more individual positions for male athletes

than for female athletes," id. at 189.  

In computing these figures, the district court

counted as participants in intercollegiate athletics for

purposes of Title IX analysis those athletes who were members

of varsity teams for the majority of the last complete

season. Id. at 192. Brown argued at trial that "there is no 

consistent measure of actual participation rates because team

size varies throughout the athletic season," and that "there

is no consistent measure of actual participation rates

because there are alternative definitions of 'participant'

that yield very different participation totals." Id. 

Reasoning that "[w]here both the athlete and coach determine

that there is a place on the team for a student, it is not

for this Court to second-guess their judgment and impose its

own, or anyone else's, definition of a valuable or genuine

varsity experience," the district court concluded that

"[e]very varsity team member is therefore a varsity

'participant.'" Id. (original emphasis omitted). Thus, the 

district court held that 

the "participation opportunities" offered
by an institution are measured by
counting the actual participants on 
intercollegiate teams. The number of

-11- -11-

participants in Brown's varsity athletic
program accurately reflects the number of
participation opportunities Brown offers
because the University, through its
practices "predetermines" the number of
athletic positions available to each
gender. 

Id. at 202-03.  

The district court found from extensive testimony

that the donor-funded women's gymnastics, women's fencing and

women's ski teams, as well as at least one women's club team,

the water polo team, had demonstrated the interest and

ability to compete at the top varsity level and would benefit

from university funding.4 Id. at 190. 

The district court did not find that full and 

effective accommodation of the athletics interests and

abilities of Brown's female students would disadvantage

Brown's male students.

II. II.

Title IX provides that "[n]o person in the United

States shall, on the basis of sex, be excluded from

participation in, be denied the benefits of, or be subjected

to discrimination under any education program or activity

receiving Federal financial assistance." 20 U.S.C.A. 

 

4. The district court noted that "there may be other women's
club sports with sufficient interest and ability to warrant
elevation to varsity status," but that plaintiffs did not
introduce at trial substantial evidence demonstrating the
existence of other women's club teams meeting the criteria.
Cohen III, 879 F. Supp. at 190 n.14. 

-12- -12-

1681(a) (West 1990). As a private institution that receives

federal financial assistance, Brown is required to comply

with Title IX. 

Title IX also specifies that its prohibition

against gender discrimination shall not "be interpreted to

require any educational institution to grant preferential or

disparate treatment to the members of one sex on account of

an imbalance which may exist" between the total number or

percentage of persons of that sex participating in any

federally supported program or activity, and "the total

number or percentage of persons of that sex in any community,

State, section, or other area." 20 U.S.C.A. 1681(b) (West

1990). Subsection (b) also provides, however, that it "shall

not be construed to prevent the consideration in any . . .

proceeding under this chapter of statistical evidence tending

to show that such an imbalance exists with respect to the

participation in, or receipt of the benefits of, any such

program or activity by the members of one sex." Id. 

Applying 1681(b), the prior panel held that Title

IX "does not mandate strict numerical equality between the

gender balance of a college's athletic program and the gender

balance of its student body." Cohen II, 991 F.2d at 894. 

The panel explained that, while evidence of a gender-based

disparity in an institution's athletics program is relevant

to a determination of noncompliance, "a court assessing Title

-13- -13-

IX compliance may not find a violation solely because there 

is a disparity between the gender composition of an

educational institution's student constituency, on the one

hand, and its athletic programs, on the other hand." Id. at 

895. 

Congress enacted Title IX in response to its

finding -- after extensive hearings held in 1970 by the House

Special Subcommittee on Education -- of pervasive

discrimination against women with respect to educational

opportunities. 118 Cong. Rec. 5804 (1972) (remarks of Sen.

Bayh); North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 523 

n.13 (1982). 

Title IX was passed with two objectives in mind:

"to avoid the use of federal resources to support

discriminatory practices," and "to provide individual

citizens effective protection against those practices."

Cannon v. University of Chicago, 441 U.S. 677, 704 (1979). 

To accomplish these objectives, Congress directed all

agencies extending financial assistance to educational

institutions to develop procedures for terminating financial

assistance to institutions that violate Title IX. 20 U.S.C.

1682.

The agency responsible for administering Title IX

is the United States Department of Education ("DED"), through

-14- -14-

its Office for Civil Rights ("OCR").5 Congress expressly

delegated to DED the authority to promulgate regulations for

determining whether an athletics program complies with Title

IX. Pub. L. No. 93-380, 88 Stat. 612 (1974).6 The

regulations specifically address athletics at 34 C.F.R. 

106.37(c) and 106.41. The regulation at issue in this case,

34 C.F.R. 106.41 (1995), provides:

(a) General. No person shall, on the 
basis of sex, be excluded from
participation in, be denied the benefits
of, be treated differently from another
person or otherwise be discriminated
against in any interscholastic,
intercollegiate, club or intramural
athletics offered by a recipient, and no
recipient shall provide any such
athletics separately on such basis.
(b) Separate teams. Notwithstanding 
the requirements of paragraph (a) of this

 

5. Agency responsibility for administration of Title IX
shifted from the Department of Health, Education and Welfare
("HEW") to DED when HEW split into two agencies, DED and the
Department of Health and Human Services. The regulations and
agency documents discussed herein were originally promulgated
by HEW, the administering agency at the time, and later
adopted by the present administering agency, DED. See Cohen 
II, 991 F.2d at 895; Cohen III, 879 F. Supp. at 194-95 n.23.  
For simplicity, we treat DED as the promulgating agency.

6. HEW apparently received an unprecedented 9,700 comments
on the proposed Title IX athletics regulations, see Haffer v. 
Temple Univ. of the Commonwealth Sys. of Higher Educ., 524 F. 
Supp. 531, 536 n.9 (1981) (citing Thomas A. Cox,
Intercollegiate Athletics and Title IX, 46 Geo. Wash. L. Rev. 
34, 40 (1977) ("Cox")), prompting former HEW Secretary Caspar
Weinberger to remark, "I had not realized until the comment
period that athletics is the single most important thing in
the United States," id. (citing Cox at 34, quoting N.Y. 
Times, June 27, 1975, at 16, col. 4). 

-15- -15-

section, a recipient may operate or
sponsor separate teams for members of
each sex where selection of such teams is
based upon competitive skill or the
activity involved is a contact sport.
However, where a recipient operates or
sponsors a team in a particular sport for
members of one sex but operates or
sponsors no such team for members of the
other sex, and athletic opportunities for
members of that sex have previously been
limited, members of the excluded sex must
be allowed to try-out for the team
offered unless the sport involved is a
contact sport. For the purposes of this
part, contact sports include boxing,
wrestling, rugby, ice hockey, football,
basketball and other sports the purpose
or major activity of which involves
bodily contact. 
c) Equal Opportunity. A recipient 
which operates or sponsors
interscholastic, intercollegiate, club or
intramural athletics shall provide equal
athletic opportunity for members of both
sexes. In determining whether equal
opportunities are available the Director
will consider, among other factors:
(1) Whether the selection of sports
and levels of competition effectively
accommodate the interests and abilities
of members of both sexes;
(2) The provision of equipment and
supplies; 
(3) Scheduling of games and practice
time;
(4) Travel and per diem allowance;
(5) Opportunity to receive coaching
and academic tutoring;
(6) Assignment and compensation for
coaches and tutors;
(7) Provision of locker rooms,
practice and competitive facilities;
(8) Provision of medical and
training facilities and services;
(9) Provision of housing and dining
facilities and services;
(10) Publicity.

-16- -16-

In the first appeal, this court held that an

institution's failure effectively to accommodate both genders

under 106.41(c)(1) is sufficient to establish a violation of

Title IX. Cohen II, 991 F.2d at 897.  

In 1978, several years after the promulgation of the

regulations, OCR published a proposed "Policy Interpretation,"

the purpose of which was to clarify the obligations of federal

aid recipients under Title IX to provide equal opportunities in

athletics programs. "In particular, this Policy Interpretation

provides a means to assess an institution's compliance with the

equal opportunity requirements of the regulation which are set

forth at [34 C.F.R. 106.37(c) and 106.41(c)]." 44 Fed. Reg.

at 71,415. After considering a large number of public comments,

OCR published the final Policy Interpretation. 44 Fed. Reg.

71,413-71,423 (1979). While the Policy Interpretation covers

other areas, this litigation focuses on the "Effective

Accommodation" section, which interprets 34 C.F.R. 

106.41(c)(1), the first of the non-exhaustive list of ten factors

to be considered in determining whether equal athletics

opportunities are available to both genders. The Policy

Interpretation establishes a three-part test, a two-part test,

and factors to be considered in determining compliance under 34

C.F.R. 106.41(c)(1). At issue in this appeal is the proper

-17- -17-

interpretation of the first of these, the so-called three-part

test,7 which inquires as follows:

(1) Whether intercollegiate level
participation opportunities for male and
female students are provided in numbers
substantially proportionate to their
respective enrollments; or
(2) Where the members of one sex
have been and are underrepresented among
intercollegiate athletes, whether the
institution can show a history and
continuing practice of program expansion
which is demonstrably responsive to the
developing interest and abilities of the
members of that sex; or
(3) Where the members of one sex
are underrepresented among
intercollegiate athletes, and the
institution cannot show a continuing
practice of program expansion such as
that cited above, whether it can be
demonstrated that the interests and
abilities of the members of that sex have
been fully and effectively accommodated
by the present program.

44 Fed. Reg. at 71,418. 

The district court held that, "because Brown

maintains a 13.01% disparity between female participation in

intercollegiate athletics and female student enrollment, it

cannot gain the protection of prong one." Cohen III, 879 F. 

Supp. at 211. Nor did Brown satisfy prong two. While

acknowledging that Brown "has an impressive history of program 

expansion," the district court found that Brown failed to

 

7. For clarification, we note that the cases refer to each
part of this three-part test as a "prong" or a "benchmark."
Prong one is also called the "substantial proportionality
test." 

-18- -18-

demonstrate that it has "maintained a continuing practice of 

intercollegiate program expansion for women, the underrepresented

sex." Id. The court noted further that, because merely reducing 

program offerings to the overrepresented gender does not

constitute program expansion for the underrepresented gender, the

fact that Brown has eliminated or demoted several men's teams

does not amount to a continuing practice of program expansion for

women. Id. As to prong three, the district court found that 

Brown had not "fully and effectively accommodated the interest 

and ability of the underrepresented sex 'to the extent necessary

to provide equal opportunity in the selection of sports and

levels of competition available to members of both sexes.'" Id. 

(quoting the Policy Interpretation, 44 Fed. Reg. at 71,417). 

On January 16, 1996, DED released a "Clarification

Memorandum," which does not change the existing standards for

compliance, but which does provide further information and

guidelines for assessing compliance under the three-part test.

The Clarification Memorandum contains many examples illustrating

how institutions may meet each prong of the three-part test and

explains how participation opportunities are to be counted under

Title IX. 

The district court found that Brown predetermines the

approximate number of varsity positions available to men and

women, and, thus, that "the concept of any measure of unfilled

but available athletic slots does not comport with reality."

-19- -19-

Cohen III, 879 F. Supp. at 203 n.36. The district court 

concluded that intercollegiate athletics opportunities "means

real opportunities, not illusory ones, and therefore should be

measured by counting actual participants." Id. at 204 (internal 

quotation marks and citations omitted). 

Title IX is an anti-discrimination statute, modeled

after Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d

("Title VI").8 See Cannon, 441 U.S. at 696 ("The drafters of 

Title IX explicitly assumed that it would be interpreted and

applied as Title VI had been during the preceding eight years.").

Thus, Title IX and Title VI share the same constitutional

underpinnings. See Jeffrey H. Orleans, An End To The Odyssey: 

Equal Athletic Opportunities For Women, 3 Duke J. Gender L. & 

Pol'y 131, 133-34 (1996).

Although the statute itself provides for no remedies

beyond the termination of federal funding, the Supreme Court has

determined that Title IX is enforceable through an implied

private right of action, Cannon, 441 U.S. at 703, and that 

damages are available for an action brought under Title IX,

Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 76 (1992). 

The right to injunctive relief under Title IX appears to have

been impliedly accepted by the Supreme Court in Franklin. Id. at 

64-66, 71-73. In addition, a majority of the Court in Guardians 

 

8. Title VI prohibits discrimination on the basis of race,
color, or national origin in institutions benefitting from
federal funds. 

-20- -20-

Ass'n v. Civil Serv. Comm'n, 463 U.S. 582 (1983), agreed that 

injunctive relief and other equitable remedies are appropriate

for violations of Title VI. 

According to the statute's senate sponsor, Title IX

was intended to

provide for the women of America
something that is rightfully theirs -- an
equal chance to attend the schools of
their choice, to develop the skills they
want, and to apply those skills with the
knowledge that they will have a fair
chance to secure the jobs of their choice
with equal pay for equal work.

118 Cong. Rec. 5808 (1972) (remarks of Sen. Bayh) (quoted 

in Haffer, 524 F. Supp. at 541). 

III. III.

In Cohen II, a panel of this court squarely rejected 

Brown's constitutional and statutory challenges to the Policy

Interpretation's three-part test, upholding the district court's

interpretation of the Title IX framework applicable to

intercollegiate athletics, Cohen II, 991 F.2d at 899-902, as well 

as its grant of a preliminary injunction in favor of the

plaintiffs, id. at 906-07. Despite the fact that it presents 

substantially the same legal arguments in this appeal as were

raised and decided in the prior appeal, Brown asserts that there

is "no impediment" to this court's plenary review of these

decided issues. We disagree.

The law of the case doctrine precludes relitigation

of the legal issues presented in successive stages of a single

-21- -21-

case once those issues have been decided. See 1B James W. Moore 

et al., Moore's Federal Practice 0.404[1] (2d ed. 1993)

(hereinafter "Moore"). "The doctrine of the law of the case

directs that a decision of an appellate court on an issue of law,

unless vacated or set aside, governs the issue during all

subsequent stages of litigation in the nisi prius court and 

thereafter on any further appeal." Commercial Union Ins. Co. v. 

Walbrook Ins. Co., 41 F.3d 764, 769 (1st. Cir. 1994) (citing 

United States v. Rivera-Martinez, 931 F.2d 148 (1st Cir.), cert. 

denied, 502 U.S. 862 (1991)). The reviewing court's mandate 

"constitutes the law of the case on such issues of law as were

actually considered and decided by the appellate court, or as

were necessarily inferred from the disposition on appeal."

Commercial Union Ins. Co., 41 F.3d at 770 (citing 1B Moore at  

0.404[10]). The doctrine requires a trial court on remand to

dispose of the case in accordance with the appellate court's

mandate by implementing "'both the letter and the spirit of the

mandate, taking into account the appellate court's opinion and

the circumstances it embraces,'" United States v. Connell, 6 F.3d 

27, 30 (1st Cir. 1993) (quoting United States v. Kikumura, 947 

F.2d 72, 76 (3d Cir. 1991)), and binds newly constituted panels

to prior panel decisions on point, e.g., Irving v. United States, 

49 F.3d 830, 833-34 (1st Cir. 1995); Metcalf & Eddy, Inc. v. 

Puerto Rico Aqueduct and Sewer Auth., 991 F.2d 935, 939 n.3 (1st 

Cir. 1993). 

-22- -22-

While we have acknowledged that there are exceptions

to the law of the case doctrine, we have emphasized that the

circumstances in which they apply are rare. As have a number of

other circuits, we have determined that issues decided on appeal

should not be reopened "'unless the evidence on a subsequent

trial was substantially different, controlling authority has

since made a contrary decision of law applicable to such issues,

or the decision was clearly erroneous and would work a manifest

injustice.'" Rivera-Martinez, 931 F.2d at 151 (quoting White v. 

Murtha, 377 F.2d 428, 432 (5th Cir. 1967)) (other citations 

omitted). 

Brown's argument that the Supreme Court's recent

decision in Adarand Constr., Inc. v. Pena, --- U.S. ---, 115 S. 

Ct. 2097 (1995) ("Adarand"), controls this case necessarily 

presumes that Adarand constitutes a contrary intervening decision 

by controlling authority on point that (i) undermines the

validity of Cohen II; (ii) compels us to depart from the law of 

the case doctrine; and (iii) therefore mandates that we reexamine

Brown's equal protection claim. 

We have narrowly confined the "intervening

controlling authority exception" to Supreme Court opinions, en 

banc opinions of this court, or statutory overrulings. Irving, 

49 F.3d at 834. We have also recognized that this exception may

apply "in those rare situations where newly emergent authority,

although not directly controlling, nevertheless offers a

-23- -23-

convincing reason for believing that the earlier panel, in light

of the neoteric developments, would change its course." Id. 

(internal quotation marks and citation omitted).

The law of the case doctrine is a prudential rule of

policy and practice, rather than "an absolute bar to

reconsideration []or a limitation on a federal court's power."

Rivera-Martinez, 931 F.2d at 150-51. Thus, we have not construed 

the doctrine as "an inflexible straitjacket that invariably

requires rigid compliance." Northeast Utils. Serv. Co. v. 

Federal Energy Regulatory Comm'n, 55 F.3d 686, 688 (1st Cir. 

1995). Nevertheless, the doctrine serves important goals and

must be "treated respectfully and, in the absence of exceptional

circumstances, applied according to its tenor." Rivera-Martinez, 

931 F.2d at 151. Accordingly, we have held that only a few

exceptional circumstances can overcome the interests served by

adherence to the doctrine and these exceptions are narrowly

circumscribed. See id.; see also United States v. Reveron 

Martinez, 836 F.2d 684, 687 n.2 (1st Cir. 1988) ("To be sure, 

there may be occasions when courts can -- and should -- loosen

the iron grip of stare decisis. But any such departure 'demands 

special justification.'") (quoting Arizona v. Rumsey, 467 U.S. 

203, 212 (1984)).9 

 

9. The law of the case doctrine is "akin to the doctrines of
collateral estoppel, res judicata, and stare decisis," Joan 
Steinman, Law Of The Case: A Judicial Puzzle In Consolidated 
And Transferred Cases And In MultiDistrict Litigation, 135 U. 
Penn. L. Rev. 595, 598-99 (1987) (footnotes omitted), and

-24- -24-

For the reasons that follow, we conclude that no

exception to the law of the case doctrine applies here and,

therefore, that Cohen II's rulings of law control the disposition 

of this appeal.

Brown contends that stare decisis does not bind this 

panel "to the previous preliminary ruling of this Court because

it lacks the element of finality," Reply Br. at 24, and that the

law of the case doctrine does not prevent a court from "changing

its mind," id. at n.47. 

We acknowledge that we have repeatedly emphasized

that conclusions and holdings regarding the merits of issues

presented on appeal from a grant of a preliminary injunction are

to be understood as statements as to probable outcomes. E.g., 

A.M. Capen's Co. v. American Trading and Prod. Co., 74 F.3d 317, 

322 (1st Cir. 1996); Narragansett Indian Tribe v. Guilbert, 934 

F.2d 4, 6 (1st Cir. 1991). The concern informing this caveat

arises when we are asked to rule on the propriety of a district

court's grant of a preliminary injunction (or otherwise issue a

preliminary ruling) without benefit of full argument and a well-

 

"has been said to lie half way between stare decisis and res 
judicata," 1B Moore at 0.404[1] n.3 (internal quotation 
marks and citation omitted). As applied in the federal
courts today, the law of the case doctrine more closely
resembles the doctrine of stare decisis. 1B Moore at  
0.404[1]. Both doctrines reflect concerns that have long
been recognized as fundamentally important to the rule of law
-- e.g., stability, predictability, and respect for judicial
authority -- and both doctrines are applied "with more or
less rigidity depending on which interest is served." Id. at 
II-2.

-25- -25-

developed record. In this case, however, the record before the

prior panel was "sufficiently developed and the facts necessary

to shape the proper legal matrix [we]re sufficiently clear,"

Cohen II, 991 F.2d at 904, and nothing in the record subsequently 

developed at trial constitutes substantially different evidence

that might undermine the validity of the prior panel's rulings of

law. In considering plaintiffs' motion for a preliminary

injunction in Cohen I, the district court (i) "paid meticulous 

attention to the parties' prospects for success over the long

haul;" (ii) "plainly visualized both the factual intricacies and

legal complexities that characterize Title IX litigation;" (iii)

"held a lengthy adversary hearing and reviewed voluminous written

submissions;" and (iv) "correctly focused on the three-part

accommodation test." Cohen II, 991 F.2d at 903. Further, as the 

district court noted in its opinion after the trial on the

merits, "[n]othing in the record before me, now fully developed,

undermines the considered legal framework established by the

First Circuit at the preliminary injunction stage." Cohen III, 

879 F. Supp. at 194. 

Brown offers remarkably little in the way of analysis

or authority to support its blithe contention that we are free to

disregard Cohen II in disposing of this appeal. Indeed, Brown 

argues as if the prior panel had not decided the precise

statutory interpretation questions presented (which it clearly

did) and as if the district court's liability analysis were

-26- -26-

contrary to the law enunciated in Cohen II (which it clearly is 

not). Finding Brown's bare assertions to be unpersuasive, we

decline the invitation to this court to "change its mind." The

precedent established by the prior panel is not clearly

erroneous; it is the law of this case and the law of this

circuit. 

IV. IV.

Brown contends that the district court misconstrued

and misapplied the three-part test. Specifically, Brown argues

that the district court's interpretation and application of the

test is irreconcilable with the statute, the regulation, and the

agency's interpretation of the law, and effectively renders Title

IX an "affirmative action statute" that mandates preferential

treatment for women by imposing quotas in excess of women's

relative interests and abilities in athletics. Brown asserts, in

the alternative, that if the district court properly construed

the test, then the test itself violates Title IX and the United

States Constitution.

We emphasize two points at the outset. First,

notwithstanding Brown's persistent invocation of the inflammatory

terms "affirmative action," "preference," and "quota," this is

not an affirmative action case. Second, Brown's efforts to evade

the controlling authority of Cohen II by recasting its core legal 

arguments as challenges to the "district court's interpretation"

of the law are unavailing; the primary arguments raised here have

-27- -27-

already been litigated and decided adversely to Brown in the

prior appeal. 

A. A.

Brown's talismanic incantation of "affirmative

action" has no legal application to this case and is not helpful

to Brown's cause. While "affirmative action" may have different

connotations as a matter of politics, as a matter of law, its

meaning is more circumscribed. True affirmative action cases

have historically involved a voluntary10 undertaking to remedy

discrimination (as in a program implemented by a governmental

body, or by a private employer or institution), by means of

specific group-based preferences or numerical goals, and a

specific timetable for achieving those goals. See Adarand, --- 

U.S. ---, 115 S. Ct. 2097 (1995) (remanding for review under

strict scrutiny a challenge to a federal statute establishing a

government-wide goal for awarding to minority businesses not less

than 5% of the total value of all prime contracts and

subcontracts for each fiscal year); Metro Broadcasting v. FCC, 

 

10. Cases and commentators sometimes treat cases involving
involuntarily implemented plans -- e.g., plans adopted
pursuant to a consent decree or a contempt order -- as
affirmative action cases. See, e.g., United States v. 
Paradise, 480 U.S. 149 (1987) (upholding a "one-black-for- 
one-white" promotion requirement ordered by a district court
as an interim measure in response to proven discrimination by
a state employer); Sheet Metal Workers v. EEOC, 478 U.S. 421 
(1986) (upholding a federal district court's imposition on
the union a goal for racial minority membership as a remedy
for the union's contempt of the court's earlier orders to
cease racially discriminatory admissions practices). 

-28- -28-

497 U.S. 547 (1990) (upholding a federal program requiring race-

based preferences); City of Richmond v. J.A. Croson Co., 488 U.S. 

469 (1989) (striking down a municipal set-aside program requiring

that 30% of the city's construction dollars be paid to racial

minority subcontractors on an annual basis); Johnson v. 

Transportation Agency, 480 U.S. 616 (1986) (upholding a temporary 

program authorizing a county agency to consider sex and race as

factors in making promotions in order to achieve a statistically

measurable improvement in the representation of women and

minorities in major job classifications in which they had been

historically underrepresented); Wygant v. Jackson Bd. of Educ., 

476 U.S. 267 (1986) (striking down a collective-bargaining

faculty lay-off provision requiring preferential treatment for

certain racial minorities); Fullilove v. Klutznick, 448 U.S. 448 

(1980) (upholding a federal program requiring state and local

recipients of federal public works grants to set aside 10% of

funds for procuring goods and services from minority business

enterprises); United Steelworkers v. Weber, 443 U.S. 193 (1979) 

(upholding a collective bargaining agreement that set aside for

blacks half the places in a new training program until the

percentage of blacks among skilled workers at the plant was

commensurate with the percentage of blacks in the local labor

force); Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265 

(1978) (striking down a state medical school's admissions policy

that set aside 16 of its places for racial minorities).

-29- -29-

Title IX is not an affirmative action statute; it is

an anti-discrimination statute, modeled explicitly after another

anti-discrimination statute, Title VI. No aspect of the Title IX

regime at issue in this case -- inclusive of the statute, the

relevant regulation, and the pertinent agency documents --

mandates gender-based preferences or quotas, or specific

timetables for implementing numerical goals. 

Like other anti-discrimination statutory schemes, the

Title IX regime permits affirmative action.11 In addition, Title 

IX, like other anti-discrimination schemes, permits an inference

that a significant gender-based statistical disparity may

indicate the existence of discrimination. Consistent with the

school desegregation cases, the question of substantial

proportionality under the Policy Interpretation's three-part test

 

11. As previously noted, Title IX itself specifies only that
the statute shall not be interpreted to require gender-based 
preferential or disparate treatment. 20 U.S.C. 1681(b).
However, although Congress could easily have done so, it did
not ban affirmative action or gender-conscious remedies under
Title IX. See also Weber, 443 U.S. at 201-02 (construing the 
prohibition against race discrimination contained in 
703(a) and (d) of Title VII, and concluding that "an
interpretation of the sections that forbade all race-
conscious affirmative action would bring about an end
completely at variance with the purpose of the statute and
must be rejected") (internal quotation marks and citations
omitted); id. at 205-06 (construing 703(j) of Title VII, 
upon which 1681(b) of Title IX was based, and concluding
that "[t]he natural inference is that Congress chose not to
forbid all voluntary race-conscious affirmative action"). 
In addition, remedial action and voluntary
affirmative action to overcome the effects of gender
discrimination are permitted under the Title IX regulations,
34 C.F.R. 106.3, and by the Policy Interpretation, 44 Fed.
Reg. at 71,416. 

-30- -30-

is merely the starting point for analysis, rather than the

conclusion; a rebuttable presumption, rather than an inflexible

requirement. See, e.g., Swann v. Charlotte-Mecklenburg Bd. of 

Educ., 402 U.S. 1, 25 (1971). In short, the substantial 

proportionality test is but one aspect of the inquiry into

whether an institution's athletics program complies with Title

IX. 

Also consistent with the school desegregation cases,

the substantial proportionality test of prong one is applied

under the Title IX framework, not mechanically, but case-by-case,

in a fact-specific manner. As with other anti-discrimination

regimes, Title IX neither mandates a finding of discrimination

based solely upon a gender-based statistical disparity, see Cohen 

II, 991 F.2d at 895, nor prohibits gender-conscious remedial 

measures. See Missouri v. Jenkins, --- U.S. ---, ---, 115 S. Ct. 

2038, 2048 (1995) (acknowledging the constitutional

permissibility of court-ordered, race-conscious remedial plans

designed to restore victims of discrimination to the positions

they would have occupied in the absence of such conduct);

Fullilove, 448 U.S. at 483 (recognizing that the authority of a 

federal court to incorporate racial criteria into a remedial

decree also extends to statutory violations and that, where

federal anti-discrimination laws have been violated, race-

conscious remedies may be appropriate); Weber, 443 U.S. at 197 

(holding that Title VII does not prohibit private employers from

-31- -31-

voluntarily implementing race-conscious measures to eliminate

"manifest racial imbalances in traditionally segregated job

categories"); McDaniel v. Barresi, 402 U.S. 39, 41 (1971) 

(recognizing that measures required to remedy race discrimination

"will almost invariably require" race-conscious classifications,

and that "[a]ny other approach would freeze the status quo that

is the very target of all desegregation processes"). 

Another important distinction between this case and

affirmative action cases is that the district court's remedy

requiring Brown to accommodate fully and effectively the

athletics interests and abilities of its women students does not

raise the concerns underlying the Supreme Court's requirement of

a particularized factual predicate to justify voluntary

affirmative action plans. In reviewing equal protection

challenges to such plans, the Court is concerned that government

bodies are reaching out to implement race- or gender-conscious

remedial measures that are "ageless in their reach into the past,

and timeless in their ability to affect the future," Wygant, 476 

U.S. at 276, on the basis of facts insufficient to support a

prima facie case of a constitutional or statutory violation,

Croson, 488 U.S. at 500, to the benefit of unidentified victims 

of past discrimination, see id. at 469; Wygant, 476 U.S. at 276. 

Accordingly, the Court has taken the position that voluntary

affirmative action plans cannot be constitutionally justified

absent a particularized factual predicate demonstrating the

-32- -32-

existence of "identified discrimination," see Croson, 488 U.S. at 

500-06, because "[s]ocietal discrimination, without more, is too

amorphous a basis for imposing a racially classified remedy,"

Wygant, 476 U.S. at 276.  

From a constitutional standpoint, the case before us

is altogether different. Here, gender-conscious relief was

ordered by an Article III court, constitutionally compelled to

have before it litigants with standing to raise the cause of

action alleged; for the purpose of providing relief upon a duly

adjudicated determination that specific defendants had

discriminated against a certified class of women in violation of

a federal anti-discrimination statute; based upon findings of

fact that were subject to the Federal Rules of Evidence. The

factual problem presented in affirmative action cases is, "Does

the evidence support a finding of discrimination such that race-

or gender-conscious remedial measures are appropriate?" We find

these multiple indicia of reliability and specificity to be

sufficient to answer that question in the affirmative.

From the mere fact that a remedy flowing from a

judicial determination of discrimination is gender-conscious, it

does not follow that the remedy constitutes "affirmative action."

Nor does a "reverse discrimination" claim arise every time an

anti-discrimination statute is enforced. While some gender-

conscious relief may adversely impact one gender -- a fact that

has not been demonstrated in this case -- that alone would not

-33- -33-

make the relief "affirmative action" or the consequence of that

relief "reverse discrimination." To the contrary, race- and

gender-conscious remedies are both appropriate and

constitutionally permissible under a federal anti-discrimination

regime, although such remedial measures are still subject to

equal protection review. See Miller v. Johnson, --- U.S. ---, -- 

-, 115 S. Ct. 2475, 2491 (1995) ("compliance with federal

antidiscrimination laws cannot justify race-based districting

where the challenged district was not reasonably necessary under

a constitutional reading and application of those laws") (citing

Shaw v. Reno, 509 U.S. 630, 653-54 (1993)). 

B. B.

Cohen II squarely rejected Brown's interpretation of 

the three-part test and carefully delineated its own, which is

now the law of this circuit as well as the law of this case. On

remand, the district court's liability analysis explicitly and

faithfully adhered to Cohen II's mandate, and we are bound to do 

the same at this stage of the litigation, absent one of the

exceptional circumstances discussed supra. Because the precise 

questions presented regarding the proper interpretation of the

Title IX framework were considered and decided by a panel of this

court in the prior appeal, and because no exception to the law of

the case doctrine is presented, we have no occasion to reopen the

issue here. Brown's rehashed statutory challenge is foreclosed

by the law of the case doctrine and we are therefore bound by the

-34- -34-

prior panel's interpretation of the statute, the regulation, and

the relevant agency pronouncements.

In its liability analysis, the district court

expressly accepted Cohen II's elucidation of the applicable law, 

Cohen III, 879 F. Supp. at 194, and applied the law in accordance 

with its mandate, id. at 210-13. Indeed, every circuit court to 

have reviewed a Title IX claim of discrimination in athletics

since Cohen II was decided is in accord with its explication of 

the Title IX regime as it applies to athletics. See Horner v. 

Kentucky High Sch. Athletics Ass'n, 43 F.3d 265 (6th Cir. 1994); 

Kelley v. Board of Trustees, 35 F.3d 265 (7th Cir. 1994), cert. 

denied, --- U.S. ---, 115 S. Ct. 938 (1995); Favia v. Indiana 

Univ. of Pa., 7 F.3d 332 (3d Cir. 1993); Roberts v. Colorado 

State Bd. of Agric., 998 F.2d 824 (10th Cir.), cert. denied, 510 

U.S. 1004 (1993). 

Cohen II held that the Policy Interpretation is 

entitled to substantial deference because it is the enforcing

agency's "considered interpretation of the regulation." 991 F.2d

at 896-97. Brown argues that the district court erred in

concluding that it was obligated to give substantial deference to

the Policy Interpretation, on the ground that "the interpretation

is not a worthy candidate for deference," Reply Br. at 15,

because "the urged interpretation is illogical, conflicts with

the Constitution, the Statute, the Regulation, other Agency

materials and practices, existing analogous caselaw and, in

-35- -35-

addition, is bad policy," id. We reject Brown's kitchen-sink 

characterization of the Policy Interpretation and its challenge

to the substantial deference accorded that document by the

district court. 

The Policy Interpretation represents the responsible

agency's interpretation of the intercollegiate athletics

provisions of Title IX and its implementing regulations. 44 Fed.

Reg. at 71,413. It is well settled that, where, as here,

Congress has expressly delegated to an agency the power to

"elucidate a specific provision of a statute by regulation," the

resulting regulations should be accorded "controlling weight

unless they are arbitrary, capricious, or manifestly contrary to

the statute." Chevron U.S.A. Inc. v. Natural Resources Defense 

Council, Inc., 467 U.S. 837, 844 (1984). It is also well 

established "'that an agency's construction of its own

regulations is entitled to substantial deference.'" Martin v. 

Occupational Safety and Health Review Comm'n, 499 U.S. 144, 150 

(1991) (quoting Lyng v. Payne, 476 U.S. 926, 939 (1986)) (other 

citation omitted). As the Supreme Court has explained,

"[b]ecause applying an agency's regulation to complex or changing

circumstances calls upon the agency's unique expertise and

policymaking prerogatives, we presume that the power

authoritatively to interpret its own regulations is a component

of the agency's delegated lawmaking powers." Martin, 499 U.S. at 

151 (citation omitted). 

-36- -36-

Applying these principles, Cohen II held that the 

applicable regulation, 34 C.F.R. 106.41, deserves controlling

weight, 991 F.2d at 895; that the Policy Interpretation warrants

substantial deference, id. at 896-97; and that, "[b]ecause the 

agency's rendition stands upon a plausible, if not inevitable,

reading of Title IX, we are obligated to enforce the regulation

according to its tenor," id. at 899 (citations omitted). Accord 

Horner, 43 F.3d at 274-75; Kelley, 35 F.3d at 270; Favia v. 

Indiana Univ. of Pa., 812 F. Supp. 578, 584 (W.D. Pa.), aff'd, 7 

F.3d 332 (3d Cir. 1993). On remand, the district court properly

applied the legal framework elucidated in Cohen II and explicitly 

followed this court's mandate in according controlling weight to

the regulation and substantial deference to the Policy

Interpretation. Cohen III, 879 F. Supp. at 197-99; accord 

Kelley, 35 F.3d at 272 (holding that "neither the regulation nor 

the policy interpretation run afoul of the dictates of Title

IX"). We hold that the district court did not err in the degree

of deference it accorded the regulation and the relevant agency

pronouncements.

C. C.

As previously noted, the district court held that,

for purposes of the three-part test, the intercollegiate

athletics participation opportunities offered by an institution

are properly measured by counting the number of actual

participants on intercollegiate teams. Cohen III, 879 F. Supp. 

-37- -37-

at 202. The Policy Interpretation was designed specifically for

intercollegiate athletics.12 44 Fed. Reg. at 71,413. Because the

athletics regulation distinguishes between club sports and

intercollegiate sports, under the Policy Interpretation, "club

teams will not be considered to be intercollegiate teams except

in those instances where they regularly participate in varsity

competition." Id. at n.1. Accordingly, the district court 

excluded club varsity teams from the definition of

"intercollegiate teams" and, therefore, from the calculation of

participation opportunities, because the evidence was inadequate

to show that the club teams regularly participated in varsity

competition. Cohen III, 879 F. Supp. at 200.  

The district court's definition of athletics

participation opportunities comports with the agency's own

definition. See Clarification Memorandum at 2 ("In determining 

participation opportunities, OCR counts the number of actual

athletes participating in the athletic program."). We find no

error in the district court's definition and calculation of the

intercollegiate athletics participation opportunities afforded to

Brown students, and no error in the court's finding of a 13.01%

disparity between the percentage of women participating in

 

12. Application of the Policy Interpretation is not limited
to intercollegiate athletics, however. The Policy
Interpretation states that "its general principles will often
apply to club, intramural, and interscholastic athletic
programs, which are also covered by the regulation." 44 Fed.
Reg. at 71,413.

-38- -38-

intercollegiate varsity athletics at Brown and the percentage of

women in Brown's undergraduate student body. 

D. D.

Brown contends that an athletics program equally

accommodates both genders and complies with Title IX if it

accommodates the relative interests and abilities of its male and 

female students. This "relative interests" approach posits that

an institution satisfies prong three of the three-part test by

meeting the interests and abilities of the underrepresented

gender only to the extent that it meets the interests and

abilities of the overrepresented gender.13 See Cohen II, 991 

F.2d at 899. 

Brown maintains that the district court's decision

imposes upon universities the obligation to engage in

preferential treatment for women by requiring quotas in excess of

women's relative interests and abilities. With respect to prong

three, Brown asserts that the district court's interpretation of

the word "fully" "requires universities to favor women's teams

and treat them better than men's [teams]. . . . forces them to

 

13. We note that Brown presses its relative interests
argument under both prong one and prong three. At trial,
Brown argued that, "in order to succeed on prong one,
plaintiffs bear the burden of proving that the percentage of
women among varsity athletes is not substantially
proportionate to the percentage of women among students 
interested in participating in varsity athletics." Cohen 
III, 879 F. Supp. at 205. At the preliminary injunction 
stage, Brown propounded the same relative interests argument
under prong three. Id. at n.41.  

-39- -39-

eliminate or cap men's teams. . . . [and] forces universities to

impose athletic quotas in excess of relative interests and

abilities." Appellant's Br. at 55.

The prior panel considered and rejected Brown's

approach, observing that "Brown reads the 'full' out of the duty

to accommodate 'fully and effectively.'" Cohen II, 991 F.2d at 

899. Under Cohen II's controlling interpretation, prong three 

"demands not merely some accommodation, but full and effective

accommodation. If there is sufficient interest and ability among

members of the statistically underrepresented gender, not slaked

by existing programs, an institution necessarily fails this prong

of the test." Id. at 898.  

Brown's interpretation of full and effective

accommodation is "simply not the law." Cohen III, 879 F. Supp. 

at 208. We agree with the prior panel and the district court

that Brown's relative interests approach "cannot withstand

scrutiny on either legal or policy grounds," Cohen II, 991 F.2d 

at 900, because it "disadvantages women and undermines the

remedial purposes of Title IX by limiting required program

expansion for the underrepresented sex to the status quo level of

relative interests," Cohen III, 879 F. Supp. at 209. After Cohen 

II, it cannot be maintained that the relative interests approach 

is compatible with Title IX's equal accommodation principle as it

has been interpreted by this circuit.

-40- -40-

Brown argues that the district court's interpretation

of the three-part test requires numerical proportionality, thus 

imposing a gender-based quota scheme in contravention of the

statute. This argument rests, in part, upon Brown's reading of

20 U.S.C. 1681(b) as a categorical proscription against

consideration of gender parity. Section 1681(b) provides:

Nothing contained in subsection (a) of
this section shall be interpreted to
require any educational institution to
grant preferential or disparate treatment
to the members of one sex on account of
an imbalance which may exist with respect
to the total number or percentage of
persons of that sex participating in or
receiving the benefits of any federally
supported program or activity, in
comparison with the total number or
percentage of persons of that sex in any 
community, State, section or other area . 
. . .

20 U.S.C.A. 1681(b) (West 1990) (emphasis added).

The prior panel, like Brown, assumed without analysis

that 1681(b) applies unequivocally to intercollegiate athletics

programs. We do not question Cohen II's application of  

1681(b). We think it important to bear in mind, however, the

congressional concerns that inform the proper interpretation of

this provision. Section 1681(b) was patterned after 703(j) of

Title VII, 42 U.S.C. 2000e-2(j), and was specifically designed

to prohibit quotas in university admissions and hiring, based

upon the percentage of individuals of one gender in a

geographical community. See H.R. Rep. No. 554, 92d Cong., 1st 

Sess. (1971), reprinted in 1972 U.S.C.C.A.N. 2462, 2590-92 

-41- -41-

(Additional Views); 117 Cong. Rec. 39,261-62 (1971) (remarks of

Rep. Quie); 117 Cong. Rec. 30,406, 30,409 (remarks of Sen. Bayh);

117 Cong. Rec. 39,251-52 (remarks of Rep. Mink and Rep. Green).

Thus, the legislative history strongly suggests that the

underscored language defines what is proscribed (in the contexts

of admissions and hiring) in terms of a geographical area, beyond 

the institution, and does not refer to an imbalance within the 

university, with respect to the representation of each gender in 

intercollegiate athletics, as compared to the gender makeup of

the student body. 

In any event, the three-part test is, on its face,

entirely consistent with 1681(b) because the test does not

require preferential or disparate treatment for either gender. 

Neither the Policy Interpretation's three-part test, nor the

district court's interpretation of it, mandates statistical 

balancing; "[r]ather, the policy interpretation merely creates a

presumption that a school is in compliance with Title IX and the

applicable regulation when it achieves such a statistical

balance." Kelley, 35 F.3d at 271.  

The test is also entirely consistent with 1681(b)

as applied by the prior panel and by the district court. As

previously noted, Cohen II expressly held that "a court assessing 

Title IX compliance may not find a violation solely because there 

is a disparity between the gender composition of an educational

institution's student constituency, on the one hand, and its

-42- -42-

athletic programs, on the other hand." 991 F.2d at 895. The

panel then carefully delineated the burden of proof, which

requires a Title IX plaintiff to show, not only "disparity

between the gender composition of the institution's student body

and its athletic program, thereby proving that there is an

underrepresented gender," id. at 901, but also "that a second 

element -- unmet interest -- is present," id., meaning that the 

underrepresented gender has not been fully and effectively

accommodated by the institution's present athletic program, id. 

at 902 (citing 44 Fed. Reg. at 71,418). Only where the plaintiff

meets the burden of proof on these elements and the institution 

fails to show as an affirmative defense a history and continuing

practice of program expansion responsive to the interests and

abilities of the underrepresented gender will liability be

established. Surely this is a far cry from a one-step imposition

of a gender-based quota. 

Brown simply ignores the fact that it is required to

accommodate fully the interests and abilities of the

underrepresented gender, not because the three-part test mandates

preferential treatment for women ab initio, but because Brown has 

been found (under prong one) to have allocated its athletics

participation opportunities so as to create a significant gender-

based disparity with respect to these opportunities, and has

failed (under prong two) to show a history and continuing

practice of expansion of opportunities for the underrepresented

-43- -43-

gender. Brown's interpretation conflates prongs one and three

and distorts the three-part test by reducing it to an abstract,

mechanical determination of strict numerical proportionality. In

short, Brown treats the three-part test for compliance as a one-

part test for strict liability. 

Brown also fails to recognize that Title IX's

remedial focus is, quite properly, not on the overrepresented

gender, but on the underrepresented gender; in this case, women.

Title IX and its implementing regulations protect the class for

whose special benefit the statute was enacted. See Cannon, 441 

U.S. at 694. It is women and not men who have historically and

who continue to be underrepresented in sports, not only at Brown,

but at universities nationwide. See Williams v. School Dist. of 

Bethlehem, Pa., 998 F.2d 168, 175 (1993) (observing that, 

although Title IX and its regulations apply equally to boys and

girls, "it would require blinders to ignore that the motivation

for promulgation of the regulation on athletics was the historic

emphasis on boys' athletic programs to the exclusion of girls'

athletic programs in high schools as well as colleges"), cert. 

denied, 510 U.S. 1043 (1994).  

The prior panel held that "[t]he fact that the

overrepresented gender is less than fully accommodated will not,

in and of itself, excuse a shortfall in the provision of

opportunities for the underrepresented gender." Cohen II, 991 

F.2d at 899. Instead, the law requires that, absent a

-44- -44-

demonstration of continuing program expansion for the

underrepresented gender under prong two of the three-part test,

an institution must either provide athletics opportunities in

proportion to the gender composition of the student body so as to

satisfy prong one, or fully accommodate the interests and

abilities of athletes of the underrepresented gender under prong

three. Id. In other words, 

If a school, like Brown, eschews the
first two benchmarks of the accommodation
test, electing to stray from substantial
proportionality and failing to march
uninterruptedly in the direction of equal
athletic opportunity, it must comply with
the third benchmark. To do so, the
school must fully and effectively
accommodate the underrepresented gender's
interests and abilities, even if that
requires it to give the underrepresented
gender (in this case, women) what amounts
to a larger slice of a shrinking
athletic-opportunity pie.

Id. at 906. 

We think it clear that neither the Title IX framework

nor the district court's interpretation of it mandates a gender-

based quota scheme. In our view, it is Brown's relative

interests approach to the three-part test, rather than the

district court's interpretation, that contravenes the language

and purpose of the test and of the statute itself. To adopt the

relative interests approach would be, not only to overrule Cohen 

II, but to rewrite the enforcing agency's interpretation of its 

own regulation so as to incorporate an entirely different

standard for Title IX compliance. This relative interests

-45- -45-

standard would entrench and fix by law the significant gender-

based disparity in athletics opportunities found by the district

court to exist at Brown, a finding we have held to be not clearly

erroneous. According to Brown's relative interests

interpretation of the equal accommodation principle, the gender-

based disparity in athletics participation opportunities at Brown

is due to a lack of interest on the part of its female students,

rather than to discrimination, and any attempt to remedy the

disparity is, by definition, an unlawful quota. This approach is

entirely contrary to "Congress's unmistakably clear mandate that

educational institutions not use federal monies to perpetuate

gender-based discrimination," id. at 907, and makes it virtually 

impossible to effectuate Congress's intent to eliminate sex

discrimination in intercollegiate athletics.

E. E.

Brown also claims error in the district court's

failure to apply Title VII standards to its analysis of whether

Brown's intercollegiate athletics program complies with Title IX.

The district court rejected the analogy to Title VII, noting

that, while Title VII "seeks to determine whether gender-neutral

job openings have been filled without regard to gender[,] Title

IX . . . was designed to address the reality that sports teams,

unlike the vast majority of jobs, do have official gender 

requirements, and this statute accordingly approaches the concept

-46- -46-

of discrimination differently from Title VII." Cohen III, 879 F. 

Supp. at 205. 

It does not follow from the fact that 1681(b) was

patterned after a Title VII provision that Title VII standards

should be applied to a Title IX analysis of whether an

intercollegiate athletics program equally accommodates both

genders, as Brown contends. While this court has approved the

importation of Title VII standards into Title IX analysis, we

have explicitly limited the crossover to the employment context.

See Cohen II, 991 F.2d at 902 (citing Lipsett v. University of 

P.R., 864 F.2d 881, 897 (1st Cir. 1988)); but see Brown v. Hot, 

Sexy and Safer Prods., Inc., 68 F.3d 525, 540 (1st Cir. 1995) 

(Title VII sexual harassment standards applied to Title IX sexual

harassment case in non-employment context), cert. denied, --- 

U.S. ---, 116 S. Ct. 1044 (1996). 

As Cohen II recognized, "[t]he scope and purpose of 

Title IX, which merely conditions government grants to

educational institutions, are substantially different from those

of Title VII, which sets basic employment standards." 991 F.2d

at 902 (citation omitted). "[W]hereas Title VII is largely

peremptory," Title IX is "largely aspirational," and thus, a

"loosely laced buskin." Id.; see also North Haven, 456 U.S. at 

521 (directing that Title IX must be accorded "a sweep as broad

as its language"). 

-47- -47-

It is imperative to recognize that athletics presents

a distinctly different situation from admissions and employment

and requires a different analysis in order to determine the

existence vel non of discrimination. While the Title IX regime 

permits institutions to maintain gender-segregated teams, the law 

does not require that student-athletes attending institutions

receiving federal funds must compete on gender-segregated teams;

nor does the law require that institutions provide completely

gender-integrated athletics programs.14 To the extent that Title

IX allows institutions to maintain single-sex teams and gender-

 

14. See 34 C.F.R. 106.41(b) (1995) ("[A] recipient may 
operate or sponsor separate teams for members of each sex
where selection for such teams is based upon competitive
skill or the activity involved is a contact sport.")
(emphasis added). Nor do the regulations require 
institutions to field gender-integrated teams: 

However, where a recipient operates or
sponsors a team in a particular sport for
members of one sex but operates or
sponsors no such team for members of the
other sex, and athletic opportunities for
members of that sex have previously been
limited, members of the excluded sex must
be allowed to try-out for the team
offered unless the sport involved is a
contact sport.

Id.  

Whether or not the institution maintains gender-
segregated teams, it must provide "gender-blind equality of
opportunity to its student body." Cohen II, 991 F.2d at 896. 
While this case presents only the example of members of the
underrepresented gender seeking the opportunity to
participate on single-sex teams, the same analysis would
apply where members of the underrepresented gender sought
opportunities to play on co-ed teams.

-48- -48-

segregated athletics programs, men and women do not compete

against each other for places on team rosters. Accordingly, and

notwithstanding Brown's protestations to the contrary, the Title

VII concept of the "qualified pool" has no place in a Title IX

analysis of equal opportunities for male and female athletes

because women are not "qualified" to compete for positions on

men's teams, and vice-versa. In addition, the concept of

"preference" does not have the same meaning, or raise the same

equality concerns, as it does in the employment and admissions

contexts.

Brown's approach fails to recognize that, because

gender-segregated teams are the norm in intercollegiate athletics

programs, athletics differs from admissions and employment in

analytically material ways. In providing for gender-segregated

teams, intercollegiate athletics programs necessarily allocate 

opportunities separately for male and female students, and, thus,

any inquiry into a claim of gender discrimination must compare 

the athletics participation opportunities provided for men with

those provided for women. For this reason, and because

recruitment of interested athletes is at the discretion of the

institution, there is a risk that the institution will recruit

only enough women to fill positions in a program that already

underrepresents women, and that the smaller size of the women's

program will have the effect of discouraging women's

participation. 

-49- -49-

In this unique context, Title IX operates to ensure

that the gender-segregated allocation of athletics opportunities

does not disadvantage either gender. Rather than create a quota

or preference, this unavoidably gender-conscious comparison

merely provides for the allocation of athletics resources and

participation opportunities between the sexes in a non-

discriminatory manner. As the Seventh Circuit observed,

"Congress itself recognized that addressing discrimination in

athletics presented a unique set of problems not raised in areas

such as employment and academics." Kelley, 35 F.3d at 270 

(citing Sex Discrimination Regulations, Hearings Before the 

Subcommittee on Post Secondary Education of the Committee on 

Education and Labor, 94th Cong., 1st Sess. at 46, 54, 125, 129, 

152, 177, 299-300 (1975); 118 Cong. Rec. 5807 (1972) (statement

of Sen. Bayh); 117 Cong. Rec. 30,407 (1971) (same)).

In contrast to the employment and admissions

contexts, in the athletics context, gender is not an irrelevant

characteristic. Courts and institutions must have some way of

determining whether an institution complies with the mandate of

Title IX and its supporting regulations to provide equal

athletics opportunities for both genders, despite the fact that

the institution maintains single-sex teams, and some way of

fashioning a remedy upon a determination that the institution

does not equally and effectively accommodate the interests and

abilities of both genders. As the Kelley Court pointed out (in 

-50- -50-

the context of analyzing the deference due the relevant athletics

regulation and the Policy Interpretation):

Undoubtedly the agency responsible for
enforcement of the statute could have
required schools to sponsor a women's
program for every men's program offered
and vice versa. . . . It was not
unreasonable, however, for the agency to
reject this course of action. Requiring
parallel teams is a rigid approach that
denies schools the flexibility to respond
to the differing athletic interests of
men and women. It was perfectly
acceptable, therefore, for the agency to
chart a different course and adopt an
enforcement scheme that measures
compliance by analyzing how a school has
allocated its various athletic resources.

Kelley, 35 F.3d at 271 (footnotes omitted). 

Each prong of the Policy Interpretation's three-part

test determines compliance in this manner.

Measuring compliance through an
evaluation of a school's allocation of
its athletic resources allows schools
flexibility in meeting the athletic
interests of their students and increases
the chance that the actual interests of
those students will be met. And if
compliance with Title IX is to be
measured through this sort of analysis,
it is only practical that schools be
given some clear way to establish that
they have satisfied the requirements of
the statute. The substantial
proportionality contained in Benchmark 1
merely establishes such a safe harbor. 

Id. (citations omitted). 

We find no error in the district court's refusal to

apply Title VII standards in its inquiry into whether Brown's

intercollegiate athletics program complies with Title IX. See 

-51- -51-

Cohen II, 991 F.2d at 901 ("[T]here is no need to search for 

analogies where, as in the Title IX milieu, the controlling

statutes and regulations are clear."). We conclude that the

district court's application of the three-part test does not

create a gender-based quota and is consistent with Title IX, 34

C.F.R. 106.41, the Policy Interpretation, and the mandate of

Cohen II.  

F. F.

Brown has contended throughout this litigation that

the significant disparity in athletics opportunities for men and

women at Brown is the result of a gender-based differential in

the level of interest in sports and that the district court's

application of the three-part test requires universities to

provide athletics opportunities for women to an extent that

exceeds their relative interests and abilities in sports. Thus,

at the heart of this litigation is the question whether Title IX

permits Brown to deny its female students equal opportunity to

participate in sports, based upon its unproven assertion that the

district court's finding of a significant disparity in athletics

opportunities for male and female students reflects, not

discrimination in Brown's intercollegiate athletics program, but

a lack of interest on the part of its female students that is

unrelated to a lack of opportunities. 

We view Brown's argument that women are less

interested than men in participating in intercollegiate

-52- -52-

athletics, as well as its conclusion that institutions should be

required to accommodate the interests and abilities of its female

students only to the extent that it accommodates the interests

and abilities of its male students, with great suspicion. To

assert that Title IX permits institutions to provide fewer

athletics participation opportunities for women than for men,

based upon the premise that women are less interested in sports

than are men, is (among other things) to ignore the fact that

Title IX was enacted in order to remedy discrimination that

results from stereotyped notions of women's interests and

abilities. 

Interest and ability rarely develop in a vacuum; they

evolve as a function of opportunity and experience. The Policy

Interpretation recognizes that women's lower rate of

participation in athletics reflects women's historical lack of

opportunities to participate in sports. See 44 Fed. Reg. at 

71,419 ("Participation in intercollegiate sports has historically

been emphasized for men but not women. Partially as a

consequence of this, participation rates of women are far below

those of men.").

Moreover, the Supreme Court has repeatedly condemned

gender-based discrimination based upon "archaic and overbroad

generalizations" about women. Schlesinger v. Ballard, 419 U.S. 

498, 508 (1975). See, e.g., Mississippi Univ. for Women v. 

Hogan, 458 U.S. 718, 725 (1982); Califano v. Webster, 430 U.S. 

-53- -53-

313, 317 (1977); Frontiero v. Richardson, 411 U.S. 677, 684-86 

(1973). The Court has been especially critical of the use of

statistical evidence offered to prove generalized, stereotypical

notions about men and women. For example, in holding that

Oklahoma's 3.2% beer statute invidiously discriminated against

males 18-20 years of age, the Court in Craig v. Boren, 429 U.S. 

190, 208-209 (1976), stressed that "the principles embodied in

the Equal Protection Clause are not to be rendered inapplicable

by statistically measured but loose-fitting generalities." See 

also id. at 202 ("statistics exhibit a variety of . . . 

shortcomings that seriously impugn their value to equal

protection analysis"); id. at 204 ("proving broad sociological 

propositions by statistics is a dubious business, and one that

inevitably is in tension with the normative philosophy that

underlies the Equal Protection Clause"); Cannon, 441 U.S. at 681 

n.2 (observing with respect to the relevance of the University of

Chicago's statistical evidence regarding the small number of

female applicants to its medical school, in comparison to male

applicants, that "the dampening impact of a discriminatory rule

may undermine the relevance of figures relating to actual 

applicants").

Thus, there exists the danger that, rather than

providing a true measure of women's interest in sports,

statistical evidence purporting to reflect women's interest

instead provides only a measure of the very discrimination that

-54- -54-

is and has been the basis for women's lack of opportunity to

participate in sports. Prong three requires some kind of

evidence of interest in athletics, and the Title IX framework

permits the use of statistical evidence in assessing the level of

interest in sports.15 Nevertheless, to allow a numbers-based

 

15. Under the Policy Interpretation,

Institutions may determine the athletic
interests and abilities of students by
nondiscriminatory methods of their
choosing provided:
a. The processes take into
account the nationally
increasing levels of women's
interests and abilities;
b. The methods of
determining interest and
ability do not disadvantage the
members of an underrepresented
sex;
c. The methods of
determining ability take into
account team performance
records; and
d. The methods are
responsive to the expressed
interests of students capable
of intercollegiate competition
who are members of an
underrepresented sex.

44 Fed. Reg. at 71,417.

The 1990 version of the Title IX Athletics
Investigator's Manual, an internal agency document, instructs
investigating officials to consider, inter alia, the 
following: (i) any institutional surveys or assessments of
students' athletics interests and abilities, see Valerie M. 
Bonnette & Lamar Daniel, Department of Education, Title IX
Athletics Investigator's Manual at 22 (1990); (ii) the
"expressed interests" of the underrepresented gender, id. at 
25; (iii) other programs indicative of interests and
abilities, such as club and intramural sports, sports
programs at "feeder" schools, community and regional sports

-55- -55-

lack-of-interest defense to become the instrument of further

discrimination against the underrepresented gender would pervert

the remedial purpose of Title IX. We conclude that, even if it

can be empirically demonstrated that, at a particular time, women

have less interest in sports than do men, such evidence, standing

alone, cannot justify providing fewer athletics opportunities for

women than for men. Furthermore, such evidence is completely

irrelevant where, as here, viable and successful women's varsity

teams have been demoted or eliminated. We emphasize that, on the

facts of this case, Brown's lack-of-interest arguments are of no

consequence. As the prior panel recognized, while the question

of full and effective accommodation of athletics interests and

abilities is potentially a complicated issue where plaintiffs

seek to create a new team or to elevate to varsity status a team

that has never competed at the varsity level, no such difficulty

 

programs, and physical education classes, id.  
As the district court noted, however, the agency
characterizes surveys as a "simple way to identify which
additional sports might appropriately be created to achieve
compliance. . . . Thus, a survey of interests would follow a 
determination that an institution does not satisfy prong
three; it would not be utilized to make that determination in
the first instance." Cohen III, 897 F. Supp. at 210 n.51; 
see 1990 Investigator's Manual at 27 (explaining that a 
survey or assessment of interests and abilities is not
required by the Title IX regulation or the Policy
Interpretation but may be required as part of a remedy when
OCR has concluded that an institution's current program does
not equally effectively accommodate the interests and
abilities of students). (We note that the text of the 1990
Investigator's Manual cited herein at page 25 was apparently
at page 27 of the copy of the Manual before the district
court.) 

-56- -56-

is presented here, where plaintiffs seek to reinstate what were

successful university-funded teams right up until the moment the

teams were demoted.16 Cohen II, 991 F.2d at 904; see also Cohen 

I, 809 F. Supp. at 992 ("Brown is cutting off varsity 

opportunities where there is great interest and talent, and where 

Brown still has an imbalance between men and women varsity

athletes in relation to their undergraduate enrollments."). 

On these facts, Brown's failure to accommodate fully

and effectively the interests and abilities of the

underrepresented gender is clearly established. See 

Clarification Memorandum at 8 ("If an institution has recently

eliminated a viable team from the intercollegiate program, OCR

will find that there is sufficient interest, ability, and

available competition to sustain an intercollegiate team in that

sport unless an institution can provide strong evidence that

interest, ability or available competition no longer exists.");

id. at 8-9 n.2 ("While [other] indications of interest may be 

helpful to OCR in ascertaining likely interest on campus,

particularly in the absence of more direct indicia[,] an

 

16. The district court found that the women's gymnastics
team had won the Ivy League championship in 1989-90 and was a
"thriving university-funded varsity team prior to the 1991
demotion;" that the donor-funded women's fencing team had
been successful for many years and that its request to be
upgraded to varsity status had been supported by the
athletics director at the time; that the donor-funded women's
ski team had been consistently competitive despite a meager
budget; and that the club-status women's water polo team had
demonstrated the interest and ability to compete at full
varsity status. Cohen III, 879 F. Supp. at 190.  

-57- -57-

institution is expected to meet the actual interests and

abilities of its students and admitted students."). Under these

circumstances, the district court's finding that there are

interested women able to compete at the university-funded varsity

level, Cohen III, 879 F. Supp. at 212, is clearly correct. 

Finally, the tremendous growth in women's

participation in sports since Title IX was enacted disproves

Brown's argument that women are less interested in sports for

reasons unrelated to lack of opportunity. See, e.g., Mike Tharp 

et al., Sports crazy! Ready, set, go. Why we love our games, 

U.S. News & World Report, July 15, 1996, at 33-34 (attributing to

Title IX the explosive growth of women's participation in sports

and the debunking of "the traditional myth that women aren't

interested in sports").

Brown's relative interests approach is not a

reasonable interpretation of the three-part test. This approach

contravenes the purpose of the statute and the regulation because

it does not permit an institution or a district court to remedy a

gender-based disparity in athletics participation opportunities.

Instead, this approach freezes that disparity by law, thereby

disadvantaging further the underrepresented gender. Had Congress

intended to entrench, rather than change, the status quo -- with

its historical emphasis on men's participation opportunities to

the detriment of women's opportunities -- it need not have gone

to all the trouble of enacting Title IX.

-58- -58-

V. V.

In the first appeal, this court rejected Brown's

Fifth Amendment equal protection challenge to the statutory

scheme. Cohen II, 991 F.2d at 900-901. Here, Brown argues that 

its challenge is to the decision of the district court. As Brown

puts it, "[t]he [equal protection] violation arises from the

court's holding that Title IX requires the imposition of quotas,

preferential treatment, and disparate treatment in the absence of

a compelling state interest and a determination that the remedial

measure is 'narrowly tailored' to serve that interest." Reply

Br. at 18 (citing Adarand, --- U.S. at ---, 115 S. Ct. at 2117). 

A. A.

To the extent that Brown challenges the

constitutionality of the statutory scheme itself, the challenge

rests upon at least two erroneous assumptions: first, that

Adarand is controlling authority on point that compels us, not 

only to consider Brown's constitutional challenge anew, but also

to apply strict scrutiny to the analysis; second, that the

district court's application of the law in its liability analysis

on remand is inconsistent with the interpretation expounded in

the prior appeal. We reject both premises.17 Brown's implicit

 

17. We assume, without deciding, that Brown has not waived
its equal protection claim and has standing to raise it.
Appellees argue that this claim is waived because Brown did
not raise it in the district court. Appellee's Br. at 55
(citing Desjardins v. Van Buren Community Hosp., 969 F.2d 
1280, 1282 (1st Cir. 1992)). Appellees also argue that, to
the extent that the equal protection claim is viable, Brown

-59- -59-

reliance on Adarand as contrary intervening controlling authority 

that warrants a departure from the law of the case doctrine is

misplaced because, while Adarand does make new law, the law it 

makes is wholly irrelevant to the disposition of this appeal,

and, even if Adarand did apply, it does not mandate the level of 

scrutiny to be applied to gender-conscious government action.

In rejecting Brown's equal protection claim, the

Cohen II panel stated, "It is clear that Congress has broad 

powers under the Fifth Amendment to remedy past discrimination."

991 F.2d at 901. The panel cited as authority Metro 

Broadcasting, 497 U.S. at 565-66 (for the proposition that 

"Congress need not make specific findings of discrimination to

grant race-conscious relief"), and Califano v. Webster, 430 U.S. 

at 317 (noting that Webster upheld a social security wage law 

that benefitted women "in part because its purpose was 'the

permissible one of redressing our society's longstanding

disparate treatment of women'"). Cohen II, 991 F.2d at 901. The 

panel also noted that, in spite of the scant legislative history

regarding Title IX as it applies to athletics, Congress heard a

great deal of testimony regarding discrimination against women in

higher education and acted to reverse the Supreme Court's

decision in Grove City College v. Bell, 465 U.S. 555, 573-74 

 

lacks standing to raise it. Appellee's Br. at 56 (citing
Powers v. Ohio, 499 U.S. 400, 111 S. Ct. 1364, 1370-71 
(1991)). Given our disposition of this claim, we do not
address these arguments. 

-60- -60-

(1984) (holding that Title IX was "program-specific" and thus

applied only to those university programs that actually receive

federal funds and not to the rest of the university), with

athletics prominently in mind. Cohen II, 991 F.2d at 901.  

In Metro Broadcasting, the Court upheld two federally 

mandated race-based preference policies under intermediate

scrutiny. 497 U.S. at 564-65 (holding that benign race-conscious

measures mandated by Congress "are constitutionally permissible

to the extent that they serve important governmental objectives

within the power of Congress and are substantially related to

achievement of those objectives"). The Metro Broadcasting Court 

applied intermediate scrutiny, notwithstanding that the previous

year, in Croson, 488 U.S. 469, the Court applied strict scrutiny 

in striking down a municipal minority set-aside program for city

construction contracts. The Metro Broadcasting Court 

distinguished Croson, noting that "[i]n fact, much of the 

language and reasoning in Croson reaffirmed the lesson of 

Fullilove18 that race-conscious classifications adopted by 

Congress to address racial and ethnic discrimination are subject

 

18. In Fullilove, a plurality of the Court applied a 
standard subsequently acknowledged to be intermediate
scrutiny, see Metro Broadcasting, 497 U.S. at 564, in 
upholding against a Fifth Amendment equal protection
challenge a benign race-based affirmative action program that
was adopted by an agency at the explicit direction of
Congress. The Fullilove plurality inquired "whether the 
objectives of th[e] legislation are within the power of 
Congress[]" and "whether the limited use of racial and ethnic
criteria . . . is a constitutionally permissible means for 
achieving the congressional objectives." 448 U.S. at 473. 

-61- -61-

to a different standard than such classifications prescribed by

state and local governments." Metro Broadcasting, 497 U.S. at 

565.

Adarand overruled Metro Broadcasting to the extent 

that Metro Broadcasting is inconsistent with Adarand's holding 

that "all racial classifications, imposed by whatever federal,

state, or local government actor, must be analyzed by a reviewing

court under strict scrutiny." Adarand, --- U.S. at ---, 115 S. 

Ct. at 2113. Brown impliedly assumes that Adarand's partial 

overruling of Metro Broadcasting invalidates the prior panel's 

disposition of Brown's equal protection challenge by virtue of

its passing citation to Metro Broadcasting. This assumption is 

erroneous because the proposition for which Cohen II cited Metro 

Broadcasting as authority has not been vitiated by Adarand, is of 

no consequence to our disposition of the issues raised in this

litigation, and is, in any event, unchallenged here.19 

B. B.

The prior panel rejected Brown's Fifth Amendment

equal protection20 and "affirmative action" challenges to the

 

19. Cohen II cited Metro Broadcasting for a general 
principle regarding Congress's broad powers to remedy
discrimination, a proposition that was not reached by
Adarand. Moreover, Webster, which Cohen II cited along with 
Metro Broadcasting, was not overruled or in any way rendered 
suspect by Adarand.  

20. It is well settled that the reach of the equal
protection guarantee of the Fifth Amendment Due Process
Clause -- the basis for Brown's equal protection claim -- is
coextensive with that of the Fourteenth Amendment Equal

-62- -62-

statutory scheme. Cohen II, 991 F.2d at 901 (finding no 

constitutional infirmity, assuming arguendo, that the regulation 

creates a classification somewhat in favor of women). Thus, to

the extent that Brown challenges the statutory scheme itself,

that challenge is foreclosed under the law of the case doctrine.

Nevertheless, the remedy ordered for a violation of a federal

anti-discrimination statute is still subject to equal protection

review, assuming that it constitutes gender-conscious government

action. See Miller, --- U.S. at ---, 115 S. Ct. at 2491. 

Therefore, we review the constitutionality of the district

court's order requiring Brown to comply with Title IX by

accommodating fully and effectively the athletics interests and

abilities of its women students. Because the challenged

classification is gender-based, it must be analyzed under the

intermediate scrutiny test. Before proceeding to the analysis,

however, we must first address Brown's challenge to the standard

of review. 

Brown concedes that Adarand "does not, in partially 

overruling Metro Broadcasting, set forth the proper standard of 

review for this case." Appellant's Br. at 29. Nevertheless,

Brown asserts that "[w]hile Adarand is a case involving racial 

classification, its analysis clearly applies to gender

classification as well." Id. at 27. Further, inappropriately 

 

Protection Clause. E.g., United States v. Paradise, 480 U.S. 
at 166 n.16; Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 
(1975). 

-63- -63-

relying on Frontiero, 411 U.S. 677, and Croson, 488 U.S. 469, 

Brown concludes that strict scrutiny applies to gender-based

classifications.21 Appellant's Br. at 29; Reply Br. at 19-20.

These conclusory assertions do not comport with the law in this

circuit.

First, as explained earlier, Adarand and Croson apply 

to review of legislative affirmative action schemes. This case

presents the issue of the legality of a federal district court's

determination, based upon adjudicated findings of fact, that a

federal anti-discrimination statute has been violated, and of the

 

21. In Frontiero, a plurality of the Court concluded that 
gender-based classifications, "like classifications based
upon race, alienage, or national origin, are inherently
suspect, and must therefore be subjected to strict judicial
scrutiny." 411 U.S. at 688. In the 23 years that have since
elapsed, this position has never commanded a majority of the
Court, and has never been adopted by this court. Whatever
may be the merits of adopting strict scrutiny as the standard
to be applied to gender-based classifications, it is
inappropriate to suggest, as Brown does, that Frontiero 
compels its application here. 
Brown's assertion that Adarand obligates this 
court to apply Croson to its equal protection claim is also 
incorrect. As noted previously, Croson is an affirmative 
action case and does not control review of a judicial
determination that a federal anti-discrimination statute has
been violated. To the extent that Brown assumes that Croson 
governs the issue of the sufficiency of the factual predicate
required to uphold a federally mandated, benign race- or
gender-based classification, that assumption is also
unfounded. As we have explained, Croson's factual concerns 
are not raised by a district court's determination --
predicated upon duly adjudicated factual findings bearing
multiple indicia of reliability and specificity -- of gender
discrimination in violation of a federal statute. We also
point out that Adarand did not reach the question of the 
sufficiency of the factual predicate required to satisfy
strict scrutiny review of a congressionally mandated race-
based classification. 

-64- -64-

statutory and constitutional propriety of the judicial remedy

ordered to provide redress to plaintiffs with standing who have

been injured by the violation. 

Second, Adarand does not even discuss gender 

discrimination, and its holding is limited to explicitly race-

based classifications. --- U.S. at ---, 115 S. Ct. at 2113. It

can hardly be assumed that the Court intended to include gender- 

based classifications within Adarand's precedential scope or to 

elevate, sub silentio, the level of scrutiny to be applied by a 

reviewing court to such classifications.

Third, even if Adarand did apply, it does not dictate 

the level of scrutiny to be applied in this case, as Brown

concedes. For the last twenty years, the Supreme Court has

applied intermediate scrutiny to all cases raising equal

protection challenges to gender-based classifications, including

the Supreme Court's most recent gender discrimination case,

United States v. Virginia, --- U.S. ---, 116 S. Ct. 2264 (1996) 

("Virginia"); see id. at 2288 (Rehnquist, C.J., concurring in the 

judgment) (collecting cases).22

 

22. We point out that Virginia adds nothing to the analysis 
of equal protection challenges to gender-based
classifications that has not been part of that analysis since
1979, long before Cohen II was decided. While the Virginia 
Court made liberal use of the phrase "exceedingly persuasive
justification," and sparse use of the formulation
"substantially related to an important governmental
objective," the Court nevertheless struck down the gender-
based admissions policy at issue in that case under
intermediate scrutiny, --- U.S. at ---, 116 S. Ct. at 2271,
2275; id. at 2288 (Rehnquist, C.J., concurring in the 

-65- -65-

Fourth, it is important to recognize that controlling

authority does not distinguish between invidious and benign

discrimination in the context of gender-based classifications, as

it has in the context of racial classifications. Neither this

court nor the Supreme Court has drawn this distinction in the

context of gender discrimination claims or held that a less

stringent standard applies in cases involving benign, rather than

invidious, gender discrimination. See Hogan, 458 U.S. at 724 & 

n.9 (reviewing benign gender-conscious admissions policy under

intermediate scrutiny and recognizing that the analysis does not

change with the objective of the classification); accord Wygant, 

476 U.S. at 273. Thus, the analytical result would be same, even

if this were an affirmative action case.

Under intermediate scrutiny, the burden of

demonstrating an exceedingly persuasive justification for a

government-imposed, gender-conscious classification is met by

showing that the classification serves important governmental

objectives, and that the means employed are substantially related

 

judgment), the standard applied to gender-based
classifications since 1976, when it was first announced in
Craig v. Boren, 429 U.S. at 197, and the test applied in both 
Metro Broadcasting and Webster.  
The phrase "exceedingly persuasive justification"
has been employed routinely by the Supreme Court in applying
intermediate scrutiny to gender discrimination claims and is,
in effect a short-hand expression of the well-established
test. See Personnel Adm'r v. Feeney, 442 U.S. 256, 273 
(1979); Kirchberg v. Feenstra, 450 U.S. 455, 461 (1981); 
Hogan, 458 U.S. at 724; J.E.B. v. Alabama ex rel. T.B., 511 
U.S. 127, 136-37 (1994). 

-66- -66-

to the achievement of those objectives. E.g., Hogan, 458 U.S. at 

724. Applying that test, it is clear that the district court's

remedial order passes constitutional muster. 

We find that the first part of the test is satisfied.

The governmental objectives of "avoid[ing] the use of federal

resources to support discriminatory practices," and "provid[ing]

individual citizens effective protection against those

practices," Cannon, 441 U.S. at 704, are clearly important 

objectives. We also find that judicial enforcement of federal

anti-discrimination statutes is at least an important

governmental objective. 

Applying the second prong of the intermediate

scrutiny test, we find that the means employed by the district

court in fashioning relief for the statutory violation are

clearly substantially related to these important objectives.

Intermediate scrutiny does not require that there be no other way

to accomplish the objectives, but even if that were the standard,

it would be satisfied in the unique context presented by the

application of Title IX to athletics. 

As explained previously, Title IX as it applies to

athletics is distinct from other anti-discrimination regimes in

that it is impossible to determine compliance or to devise a

remedy without counting and comparing opportunities with gender

explicitly in mind. Even under the individual rights theory of

equal protection, reaffirmed in Adarand, --- U.S. at ---, 115 S. 

-67- -67-

Ct. at 2112 (the equal protection guarantee "protect[s] persons,

not groups"), the only way to determine whether the rights of an

individual athlete have been violated and what relief is

necessary to remedy the violation is to engage in an explicitly

gender-conscious comparison. Accordingly, even assuming that the

three-part test creates a gender classification that favors

women, allowing consideration of gender in determining the remedy

for a Title IX violation serves the important objective of

"ensur[ing] that in instances where overall athletic

opportunities decrease, the actual opportunities available to the

underrepresented gender do not." Kelley, 35 F.3d at 272. In 

addition, a gender-conscious remedial scheme is constitutionally

permissible if it directly protects the interests of the

disproportionately burdened gender. See Hogan, 458 U.S. at 728 

("In limited circumstances, a gender-based classification

favoring one sex can be justified if it intentionally and

directly assists members of the sex that is disproportionately

burdened.").

Under Brown's interpretation of the three-part test,

there can never be a remedy for a violation of Title IX's equal

opportunity mandate. In concluding that the district court's

interpretation and application of the three-part test creates a

quota, Brown errs, in part, because it fails to recognize that

(i) the substantial proportionality test of prong one is only the

starting point, and not the conclusion, of the analysis; and (ii)

-68- -68-

prong three is not implicated unless a gender-based disparity

with respect to athletics participation opportunities has been

shown to exist. Where such a disparity has been established, the

inquiry under prong three is whether the athletics interests and

abilities of the underrepresented gender are fully and

effectively accommodated, such that the institution may be found

to comply with Title IX, notwithstanding the disparity.23 

Of course, a remedy that requires an institution to

cut, add, or elevate the status of athletes or entire teams may

impact the genders differently, but this will be so only if there

is a gender-based disparity with respect to athletics

opportunities to begin with, which is the only circumstance in

which prong three comes into play. Here, however, it has not

been shown that Brown's men students will be disadvantaged by the

full and effective accommodation of the athletics interests and

abilities of its women students.

VI. VI.

Brown assigns error to the district court's exclusion

of certain evidence pertaining to the relative athletics

interests of men and women. Reviewing the district court's

 

23. Under the three-part test, the institution may also
excuse the disparity under prong two, by showing a "history
and continuing practice of program expansion which is
demonstrably responsive to the developing interest and
abilities of the [underrepresented gender]," 44 Fed. Reg. at
71,418, in which case the compliance inquiry ends without
reaching prong three. It has been determined that Brown
cannot avail itself of this defense. See Cohen III, 879 F. 
Supp. at 211. 

-69- -69-

evidentiary rulings for abuse of discretion, see Sinai v. New 

England Tel. and Tel. Co., 3 F.3d 471, 475 (1st Cir. 1993), cert. 

denied, --- U.S. ---, 115 S. Ct. 597 (1994), we find none.  

Brown first contends that the court erred in barring

cross-examination of plaintiffs' expert Dr. Sabor on the issue of

why girls drop out of sports before reaching college. Because

Dr. Sabor's direct testimony did not address this issue, it was

within the district court's discretion to limit cross-examination

"to the subject matter of the direct examination." Fed. R. Evid.

611(b); see Ferragama v. Chubb Life Ins. Co. of Am., 94 F.3d 26, 

28 (1st Cir. 1996). 

Brown also suggests that the district court's

exclusion of statistical and survey data offered in support of

its relative interests argument constitutes error. Although the

district court excluded as full exhibits two studies, the NCAA

Gender Equity Study and the results of an undergraduate poll on

student interest in athletics, it nevertheless permitted Brown's

experts to rely on the data contained in these two reports as a

basis for their expert opinions.24 Because Brown's experts

 

24. Brown also contends that the district court erred in
excluding the NCAA Annual Report. Appellant's Br. at 56-57.
Brown merely asserts, however, that the "study was admissible
under Rule 803," id. at 57, and offers no explanation as to 
how it was prejudiced by the exclusion. Accordingly, we deem
the argument waived. Ryan v. Royal Ins. Co. of Am., 916 F.2d 
731, 734 (1st Cir. 1990) ("It is settled in this circuit that
issues adverted to on appeal in a perfunctory manner,
unaccompanied by some developed argumentation, are deemed to
have been abandoned.") (citations omitted). 

-70- -70-

relied upon the excluded data in providing their opinions on the

issue of a gender-based differential in student interest in

athletics, the evidence was before the trier of fact and any

error was, therefore, harmless. See McDonough Power Equip., Inc. 

v. Greenwood, 464 U.S. 548, 553 (1984) (instructing appellate 

courts to "ignore errors that do not affect the essential

fairness of the trial"). 

VII. VII.

It does not follow from our statutory and

constitutional analyses that we endorse the district court's

remedial order. Although we decline Brown's invitation to find

that the district court's remedy was an abuse of discretion, we

do find that the district court erred in substituting its own

specific relief in place of Brown's statutorily permissible

proposal to comply with Title IX by cutting men's teams until

substantial proportionality was achieved.

In Cohen II we stated that it is "established beyond 

peradventure that, where no contrary legislative directive

appears, the federal judiciary possesses the power to grant any 

appropriate relief on a cause of action appropriately brought

pursuant to a federal statute." 991 F.2d at 901 (citing

Franklin, 503 U.S. at 70-71). We also observed, however, that 

"[w]e are a society that cherishes academic freedom and

recognizes that universities deserve great leeway in their

operations." 991 F.2d at 906 (citing Wynne v. Tufts Univ. Sch. 

-71- -71-

of Med., 976 F.2d 791, 795 (1st Cir. 1992), cert. denied, 507 

U.S. 1030 (1993); Lamphere v. Brown Univ., 875 F.2d 916, 922 (1st 

Cir. 1989)). Nevertheless, we have recognized that academic

freedom does not embrace the freedom to discriminate. Villanueva 

v. Wellesley College, 930 F.2d 124, 129 (1st Cir. 1991) 

(citations omitted).

The district court itself pointed out that Brown may

achieve compliance with Title IX in a number of ways:

It may eliminate its athletic program
altogether, it may elevate or create the
requisite number of women's positions, it
may demote or eliminate the requisite
number of men's positions, or it may
implement a combination of these
remedies. I leave it entirely to Brown's
discretion to decide how it will balance
its program to provide equal
opportunities for its men and women
athletes. I recognize the financial
constraints Brown faces; however, its own
priorities will necessarily determine the
path to compliance it elects to take.

Cohen III, 879 F. Supp. at 214; see also Cohen II, 991 F.2d at 

898 n.15 (noting that a school may achieve compliance with Title

IX by "reducing opportunities for the overrepresented gender").

With these precepts in mind, we first examine the

compliance plan Brown submitted to the district court in response

to its order. We then consider the district court's order

rejecting Brown's plan and the specific relief ordered by the

court in its place.

Brown's proposed compliance plan stated its goal as

follows:

-72- -72-

The plan has one goal: to make the
gender ratio among University-funded
teams at Brown substantially
proportionate to the gender ratio of the
undergraduate student body. To do so,
the University must disregard the
expressed athletic interests of one
gender while providing advantages for
others. The plan focuses only on 
University-funded sports, ignoring the 
long history of successful donor-funded 
student teams. 

Brown's Plan at 1 (emphasis added).

In its introduction, Brown makes clear that it "would

prefer to maintain its current program" and that the plan

submitted

is inconsistent with Brown's philosophy
to the extent that it grants advantages
and enforces disadvantages upon student
athletes solely because of their gender
and curbs the historic role of coaches in
determining the number of athletes which
can be provided an opportunity to
participate. Nevertheless, the
University wishes to act in good faith
with the order of the Court,
notwithstanding issues of fact and law
which are currently in dispute.

Id. at 2.  

Brown states that it "seeks to address the issue of

proportionality while minimizing additional undue stress on

already strained physical and fiscal resources." Id. 

The general provisions of the plan may be summarized

as follows: (i) Maximum squad sizes for men's teams will be set

and enforced. (ii) Head coaches of all teams must field squads

that meet minimum size requirements. (iii) No additional

-73- -73-

discretionary funds will be used for athletics. (iv) Four new

women's junior varsity teams -- basketball, lacrosse, soccer, and

tennis -- will be university-funded. (v) Brown will make

explicit a de facto junior varsity team for women's field hockey. 

Id. at 3-4.  

The plan sets forth nine steps for its

implementation, id. at 4-5, and concludes that "if the Court 

determines that this plan is not sufficient to reach

proportionality, phase two will be the elimination of one or more

men's teams," id. at 5. 

The district court found Brown's plan to be "fatally

flawed" for two reasons. First, despite the fact that 76 men and

30 women participated on donor-funded varsity teams, Brown's

proposed plan disregarded donor-funded varsity teams. District

Court Order at 5-6. Second, Brown's plan "artificially boosts

women's varsity numbers by adding junior varsity positions on

four women's teams." Id. at 6. As to the propriety of Brown's 

proposal to come into compliance by the addition of junior

varsity positions, the district court held:

Positions on distinct junior varsity
squads do not qualify as "intercollegiate
competition" opportunities under the
Policy Interpretation and should not be
included in defendants' plan. As noted
in Cohen, 879 F. Supp. at 200, 
"intercollegiate" teams are those that
"regularly participate in varsity
competition." See 44 Fed. Reg. at 71,413 
n.1. Junior varsity squads, by
definition, do not meet this criterion.
Counting new women's junior varsity

-74- -74-

positions as equivalent to men's full
varsity positions flagrantly violates the
spirit and letter of Title IX; in no
sense is an institution providing equal
opportunity if it affords varsity
positions to men but junior varsity
positions to women. 

District Court Order at 6 (footnote omitted).

The district court found that these two flaws in the

proposed plan were sufficient to show that Brown had "not made a

good faith effort to comply with this Court's mandate." Id. at 

8. In criticizing another facet of Brown's plan, the

district court pointed out that

[a]n institution does not provide equal
opportunity if it caps its men's teams
after they are well-stocked with high-
caliber recruits while requiring women's
teams to boost numbers by accepting walk-
ons. A university does not treat its
men's and women's teams equally if it
allows the coaches of men's teams to set
their own maximum capacity limits but
overrides the judgment of coaches of
women's teams on the same matter.

Id. at 8-9. 

After rejecting Brown's proposed plan, but bearing in

mind Brown's stated objectives, the district court fashioned its

own remedy:

I have concluded that Brown's stated
objectives will be best served if I
design a remedy to meet the requirements
of prong three rather than prong one. In
order to bring Brown into compliance with
prong one under defendants' Phase II, I
would have to order Brown to cut enough
men's teams to eradicate approximately
213 men's varsity positions. This
extreme action is entirely unnecessary.

-75- -75-

The easy answer lies in ordering Brown to
comply with prong three by upgrading the
women's gymnastics, fencing, skiing, and
water polo teams to university-funded
varsity status. In this way, Brown could
easily achieve prong three's standard of
"full and effective accommodation of the
underrepresented sex." This remedy would
entail upgrading the positions of
approximately 40 women. In order to
finance the 40 additional women's
positions, Brown certainly will not have
to eliminate as many as the 213 men's
positions that would be cut under Brown's
Phase II proposal. Thus, Brown will
fully comply with Title IX by meeting the
standards of prong three, without
approaching satisfaction of the standards
of prong one. 

It is clearly in the best interest of
both the male and the female athletes to
have an increase in women's opportunities
and a small decrease in men's
opportunities, if necessary, rather than,
as under Brown's plan, no increase in 
women's opportunities and a large 
decrease in men's opportunities.
Expanding women's athletic opportunities
in areas where there is proven ability
and interest is the very purpose of Title
IX and the simplest, least disruptive,
route to Title IX compliance at Brown.

Id. at 11-12. 

The district court ordered Brown to "elevate and

maintain women's gymnastics, women's water polo, women's skiing,

and women's fencing to university-funded varsity status." Id. at 

12. The court stayed this part of the order pending appeal and

further ordered that, in the interim, the preliminary injunction

prohibiting Brown from eliminating or demoting any existing

women's varsity team would remain in effect. Id. 

-76- -76-

We agree with the district court that Brown's

proposed plan fell short of a good faith effort to meet the

requirements of Title IX as explicated by this court in Cohen II 

and as applied by the district court on remand. Indeed, the plan

is replete with argumentative statements more appropriate for an

appellate brief. It is obvious that Brown's plan was addressed

to this court, rather than to offering a workable solution to a

difficult problem.

It is clear, nevertheless, that Brown's proposal to

cut men's teams is a permissible means of effectuating compliance

with the statute. Thus, although we understand the district

court's reasons for substituting its own specific relief under

the circumstances at the time, and although the district court's

remedy is within the statutory margins and constitutional, we

think that the district court was wrong to reject out-of-hand

Brown's alternative plan to reduce the number of men's varsity

teams. After all, the district court itself stated that one of

the compliance options available to Brown under Title IX is to

"demote or eliminate the requisite number of men's positions."

Cohen III, 879 F. Supp. at 214. Our respect for academic freedom 

and reluctance to interject ourselves into the conduct of

university affairs counsels that we give universities as much

freedom as possible in conducting their operations consonant with

constitutional and statutory limits. Cohen II, 991 F.2d at 906; 

Villanueva, 930 F.2d at 129. 

-77- -77-

Brown therefore should be afforded the opportunity to

submit another plan for compliance with Title IX. The context of

the case has changed in two significant respects since Brown

presented its original plan. First, the substantive issues have

been decided adversely to Brown. Brown is no longer an appellant

seeking a favorable result in the Court of Appeals. Second, the

district court is not under time constraints to consider a new

plan and fashion a remedy so as to expedite appeal. Accordingly,

we remand the case to the district court so that Brown can submit

a further plan for its consideration. In all other respects the

judgment of the district court is affirmed. The preliminary

injunction issued by the district court in Cohen I, 809 F. Supp. 

at 1001, will remain in effect pending a final remedial order.

VIII. VIII.

There can be no doubt that Title IX has changed the

face of women's sports as well as our society's interest in and

attitude toward women athletes and women's sports. See, e.g., 

Frank DeFord, The Women of Atlanta, Newsweek, June 10, 1996, at 

62-71; Tharp, supra, at 33; Robert Kuttner, Vicious Circle of 

Exclusion, Washington Post, September 4, 1996, at A15. In 

addition, there is ample evidence that increased athletics

participation opportunities for women and young girls, available

as a result of Title IX enforcement, have had salutary effects in

other areas of societal concern. See DeFord, supra, at 66.  

-78- -78-

One need look no further than the impressive

performances of our country's women athletes in the 1996 Olympic

Summer Games to see that Title IX has had a dramatic and positive

impact on the capabilities of our women athletes, particularly in

team sports. These Olympians represent the first full generation

of women to grow up under the aegis of Title IX. The

unprecedented success of these athletes is due, in no small

measure, to Title IX's beneficent effects on women's sports, as

the athletes themselves have acknowledged time and again. What

stimulated this remarkable change in the quality of women's

athletic competition was not a sudden, anomalous upsurge in

women's interest in sports, but the enforcement of Title IX's

mandate of gender equity in sports. Kuttner, supra, at A15.  

Affirmed in part, reversed in part, and remanded for Affirmed in part reversed in part, and remanded for

further proceedings. No costs on appeal to either party. further proceedings. No costs on appeal to either party.

- Dissenting opinion follows - - Dissenting opinion follows -

-79- -79-

TORRUELLA, Chief Judge (Dissenting). Because I am not TORRUELLA, Chief Judge (Dissenting). 

persuaded that the majority's view represents the state of the

law today, I respectfully dissent.

I. THE LAW OF THE CASE I. THE LAW OF THE CASE

Under the doctrine of the "law of the case," a decision

on an issue of law made by the court at one stage of a case

becomes a binding precedent to be followed in successive stages

of the same litigation except in unusual circumstances. See 

Abbadessa v. Moore Business Forms, Inc., 987 F.2d 18, 22 (1st 

Cir. 1993); EEOC v. Trabucco, 791 F.2d 1, 2 (1st Cir. 1986). It 

is well established, however, that a decision of the Supreme

Court, that is rendered between two appeals and is irreconcilable

with the decision on the first appeal, must be followed on the

second appeal. See Linkletter v. Walker, 381 U.S. 618, 627 

(1965); Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct and Sewer 

Auth., 945 F.2d 10, 12 (1st Cir. 1991), rev'd on other grounds, 

506 U.S. 139 (1993); Young v. Herring, 917 F.2d 858 (5th Cir. 

1990); Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir. 1981), 

cert. denied, 459 U.S. 828 (1982). I believe that we face such a 

situation in the instant case.

A. Adarand and Metro Broadcasting A. Adarand and Metro Broadcasting 

At the time of Cohen v. Brown University, 991 F.2d 888 

(1st Cir. 1993) (Cohen II), the standard intermediate scrutiny 

test for discriminatory classifications based on sex required

that "a statutory classification must be substantially related to

-80- -80-

an important government objective." Clark v. Jeter, 486 U.S. 

456, 461 (1988); see also Mississippi Univ. for Women v. Hogan, 

458 U.S. 718, 723-24, and n.9 (1982); Mills v. Habluetzel, 456 

U.S. 91, 99 (1982); Craig v. Boren, 429 U.S. 190, 197 (1976); 

Matthews v. Lucas, 427 U.S. 495, 505-06 (1976). As was also the 

case under strict scrutiny review prior to Adarand Construction 

Inc. v. Pena, U.S. , 115 S. Ct. 2097 (1995), however, 

courts applying intermediate scrutiny sometimes allowed "benign"

gender classifications on the grounds that they were a

"reasonable means of compensating women as a class for past . . .

discrimination." Ronald D. Rotunda & John E. Novack, 3 Treatise 

on Constitutional Law 18.23, at 277; see Califano v. Webster, 

430 U.S. 313, 317 (1977) (allowing women to compute certain

social security benefits with a more favorable formula than could

be used by men); Lewis v. Cohen, 435 U.S. 948 (1978) (summary 

affirmance of a district court decision upholding a provision of

the Railroad Retirement Act that allowed women to retire at age

60 while men could not retire until age 65).

In Cohen II, we applied precisely this type of benign- 

classification analysis to what we viewed to be benign gender

discrimination by the federal government. Although Cohen II, in 

its brief discussion of the equal protection issue, does not

specify the precise standard it used, the court stated that "even

if we were to assume . . . that the regulation creates a gender

classification slanted somewhat in favor of women, we would find

-81- -81-

no constitutional infirmity." Cohen II, 991 F.2d at 901. Note 

that the focus is on the government's ability to favor women in

this context, rather than on an "important government objective,"

suggesting that the court considered the issue to be one of

benign discrimination. Indeed, no governmental interest is even

identified in Cohen II. Furthermore, both of the cases cited by 

the Court in Cohen II are cases in which a suspect classification 

was allowed because it was judged benign, see id. at 901 (citing 

Metro Broadcasting Inc. v. FCC, 497 U.S. 547 (1990) (race); 

Califano v. Webster, 430 U.S. 313 (1977) (sex)). 

Cohen II's assumption that a regulation slanted in 

favor of women would be permissible, Cohen II 991 F.2d at 901, 

and by implication that the same regulation would be

impermissible if it favored men, was based on Metro Broadcasting, 

which held that benign race-based action by the federal

government was subject to a lower standard than non-remedial

race-based action. See Metro Broadcasting, 497 U.S. at 564. 

Specifically, the Supreme Court announced that

benign race-conscious measures mandated
by Congress are constitutionally
permissible to the extent that they serve 
important governmental objectives within 
the power of Congress and are 
substantially related to achievement of 
those objectives. 

Id. at 565 (emphasis added). Although Metro Broadcasting 

explicitly discussed race-conscious rather than gender-conscious

-82- -82-

classifications, we applied its standard in Cohen II. See Cohen 

II, 991 F.2d at 901. 

Since Cohen II, however, Metro Broadcasting has been 

overruled, at least in part. See Adarand Constr. Inc. v. Pena, 

U.S. , , 115 S. Ct. 2097, 2111-12 (1995). In Adarand, 

the Supreme Court held that "all racial classifications . . .

must be analyzed under strict scrutiny." Adarand, 115 S. Ct. at 

2113. The Court in Adarand singled out Metro Broadcasting as a 

"significant departure" from much of the Equal Protection

jurisprudence that had come before it, in part because it

suggested that "benign" government race-conscious classifications

should be treated less skeptically than others. See Adarand, 115 

S. Ct. at 2112.

In Adarand, the Supreme Court reasoned that "'it may 

not always be clear that a so-called preference is in fact

benign.'" Id. (quoting Regents of Univ. of Cal. v. Bakke, 438 

U.S. 265 (1978) (opinion of Powell, J.)). Additionally, the

Supreme Court endorsed the view that

[a]bsent searching judicial inquiry into the
justification for such race-based measures,
there is simply no way of determining what
classifications are 'benign' or 'remedial'
and what classifications are in fact
motivated by illegitimate notions of racial
inferiority or simple racial politics.

Id. at 2112; see also Richmond v. J.A. Croson Co., 488 U.S. 469, 

493 (1989).

-83- -83-

It is not necessary to equate race and gender to see

that the logic of Adarand -- counseling that we focus on the 

categories and justifications proffered rather than the labels

attached -- applies in the context of gender. While cognizant of

differences between race-focused and gender-focused Equal

Protection precedent, I nevertheless think that Adarand compels 

us to view so-called "benign" gender-conscious governmental

actions under the same lens as any other gender-conscious

governmental actions. See Adarand, 115 S. Ct. at 2112; see also 

United States v. Virginia, 116 S.Ct 2264, 2274, 2277 (1996) 

(viewing Virginia's benign justification for a gender

classification skeptically); Shuford v. Alabama State Bd. of 

Educ., 897 F. Supp. 1535, 1557 (D. Ala. 1995) (stating that 

courts "must look behind the recitation of a benign purpose to

ensure that sex-based classifications redress past

discrimination"). Rather than conduct an inquiry into whether

Title IX and its resulting interpretations are "benign" or

"remedial," and conscious of the fact that labels can be used to

hide illegitimate notions of inferiority or simple politics just

as easily in the context of gender as in the context of race, we

should now follow Adarand's lead and subject all gender-conscious 

government action to the same inquiry.25

 

25. Our discussion in Cohen II also cited Califano v. 
Webster, 430 U.S. 313 (1977), which has not been explicitly 
overruled. That case concerned Congress' provision, under
the Social Security Act, for a lower retirement age for women
than for men, with the result that, as between similarly

-84- -84-

B. United States v. Virginia B. United States v. Virginia 

A second Supreme Court case has also made it necessary

to review our decision in Cohen II. In United States v. 

Virginia, 116 S.Ct. 2264 (1996), the Court faced an Equal 

Protection challenge to Virginia's practice of maintaining the

Virginia Military Institute as an all male institution. Rather

than simply apply the traditional test requiring that gender

classifications be "substantially related to an important

government objective," Clark v. Jeter 486 U.S. 456, 461 (1988), 

the Supreme Court applied a more searching "skeptical scrutiny of

official action denying rights or opportunities based on sex,"

id., at 2274, which requires that "[p]arties who seek to defend 

gender-based government action must demonstrate an 'exceedingly

persuasive justification' for that action," id. In its 

discussion, the Court stated that, in order to prevail in a

gender case, "the State must show at least that the challenged 

 

situated male and female wage-earners, the female wage-earner
would be awarded higher monthly social security payments, id. 
at 314-16. In that case, Congress specifically found that
more frequent and lower age limits were being applied to
women than to men in the labor market. Id. at 319. This led 
the Supreme Court to characterize the provision at issue as
remedial rather than benign, noting that the provision had
been repealed in 1972, roughly contemporaneously with
"congressional [anti-discrimination] reforms [that] . . .
have lessened the economic justification for the more
favorable benefit computation" for women. Id. at 320. The 
instant case should be distinguished from Califano for two 
reasons. First, Califano did not necessarily rule on benign 
classifications, as Metro Broadcasting and Adarand clearly 
did. Second, Califano, unlike the instant case, contained an 
"exceedingly persuasive justification" for its gender-
conscious state action.

-85- -85-

classification serves important governmental objectives and that

the discriminatory means employed are substantially related to

the achievement of those objectives." Id. at 2275 (internal 

quotations omitted) (emphasis added). Being "substantially

related to an important government objective," therefore, is

considered a necessary but not sufficient condition. The Court

also requires a focus on "whether the proffered justification is

"exceedingly persuasive." Id. 

Virginia "drastically revise[d] our established 

standards for reviewing sex-based classifications." Id. at 2291 

(Scalia, J. dissenting). "Although the Court in two places . . .

asks whether the State has demonstrated that the classification

serves important governmental objectives and that the

discriminatory means employed are substantially related to the

achievement of those objectives . . . the Court never answers the

question presented in anything resembling that form." Id. at 

2294 (citations omitted). "[T]he Court proceeds to interpret

'exceedingly persuasive justification' in a fashion that

contradicts the reasoning of Hogan and our other precedents." 

Id. 

What is important for our purposes is that the Supreme

Court appears to have elevated the test applicable to sex

discrimination cases to require an "exceedingly persuasive

justification." This is evident from the language of both the

majority opinion and the dissent in Virginia. 

-86- -86-

This is not just a matter of semantics. Metro 

Broadcasting, and our application of its intermediate scrutiny 

standard in Cohen II, omitted the additional "skeptical scrutiny" 

requirement of an "exceedingly persuasive justification" for

gender-based government action. Compare Virginia, 116 S.Ct. at 

2274 (citing J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 136- 

37, and n.6 (1994)), and Mississippi Univ. for Women v. Holden, 

458 U.S. 718, 724 (1982), with Metro Broadcasting, 497 U.S. at 

564-65.

I conclude, therefore, that Adarand and Virginia are 

irreconcilable with the analysis in Cohen II and, accordingly, we 

must follow the guidance of the Supreme Court in this appeal.

Under the new standards established in those cases, Cohen II is 

flawed both because it applies a lenient version of intermediate

scrutiny that is impermissible following Adarand and because it 

did not apply the "exceedingly persuasive justification" test of

Virginia. We must, as Brown urges, reexamine the Equal 

Protection challenge to the three-prong test as interpreted by

the district court.

C. Preliminary Injunction C. Preliminary Injunction

In addition to the above reasons for considering the

merits of this appeal, it is important to note that Cohen II was 

an appeal from a preliminary injunction. "When an appeal comes

to us in that posture, the appellate court's conclusions as to

the merits of the issues presented on preliminary injunction are

-87- -87-

to be understood as statements of probable outcomes, rather than

as comprising the ultimate law of the case." A.M. Capen s Co. v. 

American Trading and Prod. Co., 74 F.3d 317, 322 (1st Cir. 1996) 

(internal quotations omitted); see also Narrangansett Indian 

Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991). 

The binding authority of Cohen II, therefore, is 

lessened by the fact that it was an appeal from a preliminary

injunction. First, we now have a full record before us and a set

of well-defined legal questions presented by the appellant.

Trial on the merits has served to focus these questions and to

provide background that allows us to consider these questions in

the proper context and in detail. In its decision in Cohen II, 

this court recognized and, indeed, emphasized the fact that its

holding was only preliminary. Cohen II, 991 F.2d at 902 ("a 

party losing the battle on likelihood of success may nonetheless

win the war at a succeeding trial"). Rather than turning that

ruling into a permanent one, we should review the question in

light of the full set of facts now available.

Second, the standard of review has changed. The Cohen 

II court stated that it was adopting a deferential standard of 

review, and that "if . . . the district court made no clear error

of law or fact, we will overturn its calibration . . . only for

manifest abuse of discretion." Id. at 902. The test applied by 

the court was based on "(1) the movant's probability of victory

on the merits; (2) the potential for irreparable harm if the

-88- -88-

injunction is refused; (3) the balance of interests as between

the parties . . . and (4) the public interest." Id. The case is 

now before us on appeal from the merits and we must review it

accordingly. For the purposes of this appeal, we must review

findings of fact under a clearly erroneous standard, Reich v. 

Newspapers of New England, Inc., 44 F.3d 1060, 1069 (1st Cir. 

1995) and findings of law de novo, Portsmouth v. Schlesinger, 57 

F.3d 12, 14 (1st Cir. 1995). Because the standard has changed,

it is conceivable that the result of the analysis will change,

making review appropriate.

II. BROWN'S EQUAL PROTECTION CHALLENGE II. BROWN'S EQUAL PROTECTION CHALLENGE

Appellees have argued that the three-prong test does

not create a gender classification because the classification

applies to both women and men. Although I agree that by its

words, the test would apply to men at institutions where they are

proportionately underrepresented in intercollegiate athletics, I

cannot accept the argument that, via this provision, the

Government does not classify its citizens by gender. See United 

States v. Virginia, U.S. , 116 S. Ct. 2264, 2274-76 (1996) 

(applying Equal Protection review to "gender-based government

action" where Commonwealth of Virginia attempted to maintain two

purportedly equal single-sex institutions). Cf. Loving v. 

Virginia, 388 U.S. 1, 8-9 (1967) (stating that even though the 

statute at issue applied equally to members of different racial

classifications, it still implicated race-related Equal

-89- -89-

Protection concerns, since the statute itself contained race-

conscious classifications). The fact of gender-conscious

classification, even with equal enforcement with respect to both

genders, requires the application of a higher level of scrutiny

than rational basis review. We cannot pretend that an

interpretation of a statute that contains explicit categorization

according to gender and that has intentional gender-conscious

effect does not represent gender-based government action. Equal

Protection is implicated where the claim is made that a

classification made by the government intentionally subjects an

individual to treatment different from similarly situated

individuals based on an impermissible characteristic, such as

race, national origin, or gender. Ronald D. Rotunda & John E.

Nowak, 3 Treatise on Constitutional Law 18.2, at 7-8 (2d ed. 

1992).

A. The District Court's Construction of the Three- The District Court's Construction of the Three-
Prong Test Prong Test

1. Prong One 1. Prong One

A central issue in this case is the manner in which

athletic "participation opportunities" are counted. During the

1990-91 academic year, Brown fielded 16 men s and 15 women s

varsity teams on which 566 men and 328 women participated. By

the 1993-94 year, there were 12 university-funded men s teams and

13 university funded women s teams. These teams included 479 men

and 312 women. Based on an analysis of membership in varsity

teams, the district court concluded that there existed a

-90- -90-

disparity between female participation in intercollegiate

athletics and female student enrollment.

Even assuming that membership numbers in varsity sports

is a reasonable proxy for participation opportunities -- a view

with which I do not concur -- contact sports should be eliminated

from the calculus. The regulation at 34 C.F.R. 106.41(b)

(1995) provides that an academic institution may operate separate

teams for members of each sex "where selection of such teams is

based upon competitive skill or the activity involved is a

contact sport." 34 C.F.R. 106.41(b). When a team is sponsored

only for one sex, however, and where "athletic opportunities for

members of that sex have previously been limited, members of the

excluded sex must be allowed to try-out for the team offered

unless the sport involved is a contact sport," id. (emphasis 

added). The regulation, therefore, allows schools to operate

single-sex teams in contact sports. In counting participation

opportunities, therefore, it does not make sense to include in

the calculus athletes participating in contact sports that

include only men s teams. For example, if a university chooses

to sponsor a football team, it is permitted to sponsor only a

men s team. Not all sports are the same and the university

should be given the flexibility to determine which activities are

most beneficial to its student body. By including in its

accounting a contact sport that requires very large numbers of

participants, e.g., football, the district court skews the number

-91- -91-

of athletic participants -- making it impossible for the

university to provide both men's and women's teams in other

sports.

If the athletes competing in sports for which the

university is permitted to field single-sex teams are excluded

from the calculation of participation rates, the proportion of

women participants would increase dramatically and prong one

might be satisfied. If so, the inquiry ends and Brown should be

judged to be in compliance.

2. Prong Two 2. Prong Two

The district court concluded, and the majority appears

to agree, that Brown failed to satisfy prong two because "merely

reducing program offerings to the overrepresented gender does not

constitute program expansion for the underrepresented gender."

Majority Opinion at 18. This is a curious result because the

entire three-prong test is based on relative participation rates. 

Prong one, for example, requires that participation opportunities

be provided proportionately to enrollment, but does not mandate

any absolute number of such opportunities. The district court s

conclusion with respect to prong two, however, implies that a

school must not only demonstrate that the proportion of women in

their program is growing over time, it must also show that the

absolute number of women participating is increasing.26 

 

26. This requirement presents a dilemma for a school in
which women are less interested in athletics, as Brown
contends is the case. Under such conditions, a school may be

-92- -92-

Under the district court's interpretation, a school

facing budgetary constraints must, in order to comply with prong

two, increase the opportunities available to the underrepresented 

gender, even if it cannot afford to do so. Rather than

respecting the school s right to determine the role athletics

will play in the future -- including reducing the opportunities

available to the formerly overrepresented gender to ensure

proportionate opportunities -- the district court and the

majority demand that the absolute number of opportunities 

provided to the underrepresented gender be increased. I see no

possible justification for this interpretation -- the regulation

is intended to protect against discrimination, not to promote

athletics on college campuses. A school is not required to

sponsor an athletic program of any particular size. It is not

for the courts, or the legislature, for that matter, to mandate

programs of a given size. The most that can be demanded is that

athletics be provided in a non-discriminatory manner.

Furthermore, the claim that a reduction in the

opportunities given to the overrepresented gender is an

unacceptable method of coming into compliance with the three

prong test is contrary to both Cohen II and comments of the 

majority opinion. The majority quotes approvingly from Cohen v. 

Brown Univ., 879 F. Supp. 185 (D.R.I. 1995) (Cohen III), to 

 

unable to succeed under the second prong because there may
not be enough interested female students to achieve a
continuing increase in the number of female participants.

-93- -93-

demonstrate the many ways in which a university might achieve

compliance:

It may eliminate its athletic program
altogether, it may elevate or create the
requisite number of women s positions, it
may demote or eliminate the requisite
number of men s positions, or it may
implement a combination of these
remedies.

Majority Opinion at 70 (quoting Cohen III). This conclusion is 

consistent with Cohen II, which states that a school may achieve 

compliance by reducing opportunities for the overrepresented

gender. See Cohen II, 991 F.2d at 898 n.15. I fail to see how 

these statements can be reconciled with the claim that Brown

cannot satisfy prong two by reducing the number of participation

opportunities for men.

3. Prong Three 3. Prong Three

Prong three of the three-prong test states that, where

an institution does not comply with prongs one or two, compliance

will be assessed on the basis of

whether it can be demonstrated that the
interests and abilities of the members of
th[e] [proportionately underrepresented]
sex have been fully and effectively
accommodated by the present program.

44 Fed. Reg. 71,413, 71,418 (December 11, 1979).

According to the district court, Brown's athletics

program violates prong three because members of the

proportionately underrepresented sex have demonstrated interest

sufficient for a university-funded varsity team that is not in

-94- -94-

fact being funded. The district court asserts that this is not a

quota. Brown, on the other hand, argues that prong three is

satisfied when (1) the interests and abilities of members of the

proportionately underrepresented gender (2) are accommodated to

the same degree as the proportionately overrepresented gender.

The district court's narrow, literal interpretation

should be rejected because prong three cannot be read in

isolation. First, as Brown points out, the Regulation that

includes prong three provides that, in assessing compliance under

the regulation, "the governing principle in this area is that the

athletic interests and abilities of male and female students be 

equally effectively accommodated." Policy Interpretation, 44 

Fed. Reg. 71,413, 71,414. Thus, Brown contends, to meet "fully"

-- in an absolute sense -- the interests and abilities of an

underrepresented gender, while unmet interest among the

overrepresented gender continues, would contravene the governing

principle of "equally effective accommodat[ion]" of the interests

and abilities of students of both genders.

It is also worthwhile to note that to "fully"

accommodate the interests and abilities of the underrepresented

sex is an extraordinarily high -- perhaps impossibly so --

requirement. How could an academic institution with a large and

diverse student body ever "fully" accommodate the athletic

interests of its students? Under even the largest athletic

program, it would be surprising to find that there is not a

-95- -95-

single student who would prefer to participate in athletics but

does not do so because the school does not offer a program in the

particular sport that interests the student. To read fully in an

absolute sense would make the third prong virtually impossible to

satisfy and, therefore, an irrelevant addition to the test.

This difficulty was recognized in Cohen II, which 

stated that "the mere fact that there are some female students

interested in a sport does not ipso facto require the school to 

provide a varsity team in order to comply with the third

benchmark." Cohen II 991 F.2d at 898. The balance that Cohen II 

advocates would require the institution to ensure "participatory

opportunities . . . when, and to the extent that, there is

sufficient interest and ability among the members of the excluded

sex to sustain a viable team." Id. (internal citations omitted). 

This standard may be practical for certain sports that require

large teams, but what of individual sports? A "viable" tennis

team may require only a single player. The same could be said of

any individual sport, including golf, track and field, cycling,

fencing, archery, and so on. Therefore, we still have the

problem that to "fully accommodate" the interests of the

underrepresented sex may be impossible under the district court's

interpretation.

In light of the above, Brown argues that prong three is

in fact ambiguous with respect to whether "fully" means (1) an

institution must meet 100% of the underrepresented gender's unmet

-96- -96-

reasonable interest and ability, or (2) an institution must meet

the underrepresented gender's unmet reasonable interest and

ability as fully as it meets those of the overrepresented gender.

I agree with Brown that, in the context of OCR's Policy

Interpretation, prong three is susceptible to at least these two

plausible interpretations. 

Additionally, section 1681(a), a provision enacted by

Congress as part of Title IX itself, casts doubt on the district

court's reading of prong three. 20 U.S.C. 1681(a) (1988). As

Brown points out, Title IX, of which the Policy Interpretation is

an administrative interpretation, contains language that

prohibits the ordering of preferential treatment on the basis of

gender due to a failure of a program to substantially mirror the

gender ratio of an institution. Specifically, with respect to

Title IX's guarantee that no person shall be excluded on the

basis of sex from "participation in, denied the benefits of or

subjected to discrimination under any education program or

activity receiving Federal financial assistance," 20 U.S.C. 

1681(a),

[n]othing contained [therein] shall be
interpreted to require any educational
institution to grant preferential or
disparate treatment to the members of one
sex on account of an imbalance which may
exist with respect to the total number or
percentage of persons of the sex
participating in or receiving the
benefits of any federally supported
program or activity, in comparison with
the total number or percentage of persons
of that sex in any community.

-97- -97-

Id. 1681(b). Section 1681(b) provides yet another reason why 

the district court's reading of prong three is troublesome and

why Brown's reading is a reasonable alternative.

Since the applicable regulation, 34 C.F.R. 106.41,

and policy interpretation, 44 Fed. Reg. 71,418, are not

manifestly contrary to the objectives of Title IX, and Congress

has specifically delegated to an agency the responsibility to

articulate standards governing a particular area, we must accord

the ensuing regulation considerable deference. Chevron, U.S.A. 

v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 

(1984). That notwithstanding, where -- as here -- the resulting

regulation is susceptible to more than one reasonable

interpretation, we owe no such deference to the interpretation

chosen where the choice is made not by the agency but by the

district court. Therefore, like other cases of statutory

interpretation, we should review the district court's reading de 

novo. 

B. The District Court's Interpretation and the B. The District Court's Interpretation and the
Resulting Equal Protection Problem Resulting Equal Protection Problem

The district court's interpretation of prongs one and

three creates an Equal Protection problem, which I analyze in two

steps. First, the district court's interpretation creates a

quota scheme. Second, even assuming such a quota scheme is

otherwise constitutional, appellees have not pointed to an

"exceedingly persuasive justification," see Virginia, 116 S.Ct. 

at 2274, for this particular quota scheme.

-98- -98-

1. The Quota 1. The Quota

I believe that the three prong test, as the district

court interprets it, is a quota. I am in square disagreement

with the majority, who believe that "[n]o aspect of the Title IX

regime at issue in this case . . . mandates gender-based

preferences or quotas." Majority Opinion at 29. Put another

way, I agree that "Title IX is not an affirmative action

statute," id., but I believe that is exactly what the district 

court has made of it. As interpreted by the district court, the

test constitutes an affirmative action, quota-based scheme.

I am less interested in the actual term "quota" than

the legally cognizable characteristics that render a quota scheme

impermissible. And those characteristics are present here in

spades. I am not persuaded by the majority's argument that the

three-part test does not constitute a quota because it does not

permit an agency or court to find a violation solely on the basis

of prong one of the test; instead, an institution must also fail

prongs two and three. As Brown rightly argues, the district

court's application of the three-prong test requires Brown to

allocate its athletic resources to meet the as-yet-unmet interest

of a member of the underrepresented sex, women in this case,

while simultaneously neglecting any unmet interest among

individuals of the overrepresented sex. To the extent that the

rate of interest in athletics diverges between men and women at

any institution, the district court's interpretation would

-99- -99-

require that such an institution treat an individual male

student's athletic interest and an individual female student's

athletic interest completely differently: one student's

reasonable interest would have to be met, by law, while meeting 

the other student's interest would only aggravate the lack of

proportionality giving rise to the legal duty. "The injury in

cases of this kind is that a 'discriminatory classification

prevent[s] . . . competition on an equal footing.'" Adarand, 115 

S. Ct. at 2104 (quoting Northeast Fla. Chapter, Assoc'd Gen'l 

Contractors of America v. Jacksonville, 508 U.S. 656, 666 

(1993)). As a result, individual male and female students would

be precluded from competing against each other for scarce

resources; they would instead compete only against members of

their own gender. Cf. Hopwood v. Texas, 78 F.3d 932, 943-46 (5th 

Cir.) (concluding that not only would government action

precluding competition between individuals of different races for

law school admissions be unconstitutional, but in fact even

partial consideration of race among other factors would be

unconstitutional), cert. denied, 116 S.Ct. 2581 (1996).27 

 

27. In response, appellees cite Kelley v. Board of Trustees, 
35 F.3d 265 271 (1994), for the proposition that the three-
prong test does not constitute a quota, because it does not
"require any educational institution to grant preferential or
disparate treatment" to the gender underrepresented in that
institution's athletic program. Id. However, in Kelley, the 
Seventh Circuit, unlike the district court, did not use the
three-prong test as a definitive test for liability. Rather,
the Seventh Circuit endorsed the test as one for compliance,
in dismissing the plaintiff's claims. The Seventh Circuit 
did not consider the question of whether, had the defendant

-100- -100-

The majority claims that "neither the Policy

Interpretation nor the district court's interpretation of it,

mandates statistical balancing." Majority Opinion at 41. The 

logic of this position escapes me. A school can satisfy the test

in three ways. The first prong is met if the school provides

participation opportunities for male and female students in

numbers substantially proportionate to their enrollments. This

prong surely requires statistical balancing. The second prong is

satisfied if an institution that cannot meet prong one can show a

"continuing practice of program expansion which is demonstrably

responsive to the developing interest and abilities of the

members of the underrepresented sex." 44 Fed. Reg. at 71,418.

It can hardly be denied that this prong requires statistical

balancing as it is essentially a test that requires the school to

show that it is moving in the direction of satisfying the first

prong. Establishing that a school is moving inexorably closer to

satisfying a requirement that demands statistical balancing can

only be done by demonstrating an improvement in the statistical

balance. In other words, the second prong also requires

balancing. Finally, the third prong, interpreted as the majority

advocates, dispenses with statistical balancing only because it

 

University of Illinois not been in compliance, lack of 
compliance with the three-prong test alone would trigger 
automatic liability, nor did the Seventh Circuit spell out
what steps would have been required of defendant. At any
rate, Kelley pre-dates the Supreme Court's opinions in 
Adarand and Virginia, meaning that it suffers from the same 
defects as Cohen II. 

-101- -101-

choose to accord zero weight to one side of the balance. Even a

single person with a reasonable unmet interest defeats

compliance. This standard, in fact, goes farther than the

straightforward quota test of prong one. According to the

district court, the unmet interests of the underrepresented sex

must be completely accommodated before any of the interest of the 

overrepresented gender can be accommodated.28

A pragmatic overview of the effect of the three-prong

test leads me to reject the majority's claim that the three-prong

test does not amount to a quota because it involves multiple

prongs. In my view it is the result of the test, and not the

number of steps involved, that should determine if a quota system

exists. Regardless of how many steps are involved, the fact

remains that the test requires proportionate participation

opportunities for both sexes (prong one) unless one sex is simply

not interested in participating (prong three). It seems to me

that a quota with an exception for situations in which there are

 

28. The problem with the majority s argument can be
illustrated with a hypothetical college admissions policy
that would require proportionality between the gender ratio
of the local student aged population and that of admitted
students. This policy is comparable to prong one of the
three prong test and is, without a doubt, a quota. It is no
less a quota if an exception exists for schools whose gender
ratio differs from that of the local population but which
admit every applicant of the underrepresented gender. It
remains a quota because the school is forced to admit every
female applicant until it reaches the requisite proportion.
Similarly, the district court's interpretation requires the
school to accommodate the interests of every female student
until proportionality is reached.

-102- -102-

insufficient interested students to allow the school to meet it

remains a quota. All of the negative effects of a quota

remain,29 and the school can escape the quota under prong three

only by offering preferential treatment to the group that has

demonstrated less interest in athletics.

2. "Extremely Persuasive Justification" Test 2. "Extremely Persuasive Justification" Test

In view of the quota scheme adopted by the district

court, and Congress' specific disavowal of any intent to require

quotas as part of Title IX, appellees have not met their burden

of showing an "exceedingly persuasive justification" for this

gender-conscious exercise of government authority. As recently

set forth in Virginia, "[p]arties who seek to defend gender-based 

government action must demonstrate an 'exceedingly persuasive

justification' for that action." Virginia, 116 S.Ct. at 2274. 

While the Supreme Court in Virginia acknowledged that "[p]hysical 

differences between men and women . . . are enduring," id. at 

2276, it went on to state that such "'[i]nherent differences'

between men and women, we have come to appreciate, remain cause

for celebration, but not for . . . artificial constraints on an

individual's opportunity." Id. 

 

29. Nor does the second prong of the test change the
analysis. That prong merely recognizes that a school may not
be able to meet the quotas of the first or third prong
immediately, and therefore deems it sufficient to show
program expansion that is responsive to the interests of the
underrepresented sex.

-103- -103-

Neither appellees nor the district court have

demonstrated an "exceedingly persuasive justification" for the

government action that the district court has directed in this

case. In fact, appellees have failed to point to any 

congressional statement or indication of intent regarding a

proportional representation scheme as applied by the district

court. While they point to Congress' decision to delegate

authority to the relevant agencies, this does not amount to a

genuine -- that is, not hypothesized or invented in view of

litigation, id. at 2275 -- exceedingly persuasive justification 

in light of section 1681(b)'s "no quota" provision. We are left

with the explanations discussed in Cohen II to the effect that 

Congress conducted hearings on the subject of discrimination

against women in education. There is little more than that,

because Congress adopted Title IX as a floor amendment without

committee hearings or reports. See Cohen II, 991 F.2d at 893. 

I believe that the district court's interpretation of

the Policy Interpretation's three-prong test poses serious

constitutional difficulties. "[W]here an otherwise acceptable

construction of a statute would raise serious constitutional

problems, [we] construe the statute to avoid such problems unless

such construction is plainly contrary to the intent of Congress."

Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. 

Trades Council, 485 U.S. 568 (1988); see NLRB v. Catholic Bishop 

of Chicago, 440 U.S. 490, 507 (1979). To the extent that 

-104- -104-

Congress expressed a specific intent germane to the district

court's interpretation, Congress, if anything, expressed an

aversion to quotas as a method to enforce Title IX. As a result,

I opt for Brown's construction of prong three, which, as we have

discussed, infra, is also a reasonable reading. 

Accordingly, I would reverse and remand for further

proceedings.

III. Evidentiary Issues III. Evidentiary Issues

In disputes over the representation of women in

athletic programs, it is inevitable that statistical evidence

will be relevant. There is simply no other way to assess

participation rates, interest levels, and abilities. The

majority opinion, however, offers inconsistent guidance with

respect to the role of statistics in Title IX claims. Early in

the opinion, the majority approvingly cites to the statistical

evaluations conducted in Cohen I, Cohen II, and Cohen III. 

Majority Opinion at 8-10. The figures in question demonstrate

that women s participation in athletics is less than proportional

to their enrollment. Later in the opinion, however, when the

level of interest among women at Brown is at issue, the court

adopts a much more critical attitude towards statistical

evidence: "[T]here exists the danger that, rather than providing

a true measure of women s interest in sports, statistical

evidence purporting to reflect women s interest instead provides

only a measure of the very discrimination that is and has been

-105- -105-

the basis for women s lack of opportunity." Majority Opinion at

53. In other words, evidence of differential levels of interest

is not to be credited because it may simply reflect the result of

past discrimination.

The refusal to accept surveys of interest levels as

evidence of interest raises the question of what indicators might

be used. The majority offers no guidance to a school seeking to

assess the levels of interest of its students. Although the

three-prong test, even as interpreted by the district court,

appears to allow the school the opportunity to show a lack of

interest, the majority rejects the best -- and perhaps the only -

- mechanism for making such a showing.

Brown claims that the district court erred in excluding

evidence pertaining to the relative athletic interests of men and

women at the university. Brown sought to introduce the NCAA

Gender Equity Study and the results of an undergraduate poll on

student interest in athletics, but was not permitted to do so.

The majority is unsympathetic to Brown's claim that the disparity

between athletic opportunities for men and women reflect a

gender-based difference in interest levels. Indeed, despite

Brown's attempt to present evidence in support of its claim, the

majority characterizes Brown's argument as an "unproven

assertion." Majority Opinion at 51.30

 

30. Among the evidence submitted by Brown are: (i)
admissions data showing greater athletic interest among male
applicants than female applicants; (ii) college board data

-106- -106-

Furthermore, the majority recognizes that institutions

are entitled to use any nondiscriminatory method of their

choosing to determine athletic interests. Majority Opinion at 53

n.15. If statistical evidence of interest levels is not to be

considered by courts, however, there is no way for schools to

determine whether they are in compliance. Any studies or surveys

they might conduct in order to assess their own compliance would,

in the event of litigation, be deemed irrelevant. Regardless of

the efforts made by the academic institution, the specter of a

lawsuit would be ever-present.

In addition, the majority has put the power to control

athletics and the provision of athletic resources in the hands of

the underrepresented gender. Virtually every other aspect of

college life is entrusted to the institution, but athletics has

now been carved out as an exception and the university is no

longer in full control of its program. Unless the two genders

 

showing greater athletic interest and prior participation
rates by prospective male applicants than female applicants;
(iii) data from the Cooperative Institutional Research
Program at UCLA indicating greater athletic interest among
men than women; (iv) an independent telephone survey of 500
randomly selected Brown undergraduates that reveals that
Brown offers women participation opportunities in excess of
their representation in the pool of interested, qualified
students; (v) intramural and club participation rates that
demonstrate higher participation rates among men than women;
(vi) walk-on and try-out numbers that reflect a greater
interest among men than women; (vii) high school
participation rates that show a much lower rate of
participation among females than among males; (viii) the NCAA
Gender Equity Committee data showing that women across the
country participate in athletics at a lower rate than men.

-107- -107-

participate equally in athletics, members of the underrepresented

sex would have the ability to demand a varsity level team at any

time if they can show sufficient interest. Apparently no weight

is given to the sustainability of the interest, the cost of the

sport, the university s view on the desirability of the sport,

and so on.

IV. FIRST AMENDMENT ISSUE IV. FIRST AMENDMENT ISSUE

Finally, it is important to remember that Brown

University is a private institution with a constitutionally

protected First Amendment right to choose its curriculum.

Athletics are part of that curriculum. Although the protections

of the First Amendment cannot be used to justify discrimination,

this court should not forget that it has a duty to protect a

private institution s right to mould its own educational

environment.

The majority pays lip service to these concerns in the

final pages of its long opinion, stating that " we are a society

that cherishes academic freedom and recognizes that universities

deserve great leeway in their operations. " Majority Opinion at

69 (quoting Cohen II, 991 F.2d at 906), and "[o]ur respect for 

academic freedom and reluctance to interject ourselves into the

conduct of university affairs counsels that we give universities

as much freedom as possible." Majority Opinion at 75. Despite

these statements, however, the majority in its opinion today, and

the district court before it, have failed to give Brown

-108- -108-

University freedom to craft its own athletic program and to

choose the priorities of that program. Instead, they have

established a legal rule that straightjackets college athletics

programs by curtailing their freedom to choose the sports they

offer. 

-109- -109-